Jones, Chief Judge,
delivered the opinion of the court:
Plaintiff is a small, family-owned corporation. In 1953 and 1954, the plaintiff paid some $300,000 in compensation to its managing executives. For Federal income tax purposes it deducted this amount from gross income as an ordinary and necessary expense of carrying on the business. The Commissioner of Internal Revenue disallowed the deductions as being unreasonable allowances for personal service compensation and assessed deficiencies for both years. The plaintiff paid the additional assessment under protest and now sues for a refund of such payments.
The facts have been set out in detail in the findings and we shall restate them only briefly. The Irby Construction Company was almost altogether a service organization. It was incorporated in 1946 and had as its main purpose the erection of power distribution and transmission lines. At this time such construction had already acquired the specialized name of pole line construction to distinguish its unique place in the construction industry. For several years the United States Rural Electrification Administration had been encouraging pole line construction and between 1946 and 1948 construction projects were plentiful. By 1950 the volume of work available had declined and the keen competition steadily thinned the ranks of those in the pole line construction business. The plaintiff was outstanding among the surviv *344 ing companies due almost entirely to tbe competence and integrity of its managing executive, Stuart C. Irby, Senior (whom we shall call hereafter Irby Senior). Business did not long stay depressed. In 1951 the Rural Telephone Administration was established under the aegis of the REA to promote the extension of rural telephone lines and service. When the plaintiff undertook and successfully performed the first RTA contracts in the southern area it took a lead in the industry it was not soon to surrender.
But as eternal vigilance is the price of liberty, so too has it been the price of success in the pole line construction business. Each project had to be won by competitive bid and completed under circumstances which usually required stringent economies if profits were to result. In contrast to ordinary manufacturing businesses, there were no established markets for the exchange of goods, and profits did not flow to construction companies simply as a result of routine manufacturing and sales procedures. Established lines of credit and a top reputation were essential assets to a construction business but they alone could not guarantee continuity either of business or profits. Responsible management remained the key to the success of a pole line business, and managerial responsibility was almost always placed on one man in each business. It was the job of this managing executive to prepare winning bids and then to supervise the efficient and profitable performance of the contract. He was the indispensable heart of the business and his importance was universally recognized and rewarded with high salaries.
From 1946 to 1952 Irby Senior was the plaintiff’s managing executive. Stuart C. Irby, Junior (hereinafter designated Irby Junior) joined the plaintiff in 1948, and under the guiding hand of his father rapidly assimilated the skills required for successful operation. By the end of 1951, Irby Junior had proved his ability and during 1952 he was virtually in control of the business. In 1952 Irby Junior’s salary had increased to $21,000.
It must be understood that during the period in question ownership of the plaintiff corporation was maintained to a high degree by the Irby family. Shares owned by Irby Senior, his son and daughter and his grandchildren ac *345 counted for more than 70 percent of the shares outstanding. Irby Senior had the highest share personally, 37.4 percent in 1953 and 34.6 percent in 1954. Irby Junior, second only to his father, owned 25.7 percent in 1953 and 30.8 percent in 1954.
At the end of 1952, Irby Junior suggested a compensation plan whereby certain employees of the corporation who were not members of the Irby family would be permitted a share in the profits of the corporation in addition to salary. Also, Irby Junior suggested a plan whereby he would receive a calculated share of the profits in lieu of salary. The plans were agreed upon between father and son, and were formally adopted by the company’s board of directors. The agreements, adopted in February 1953, were in effect for 1953 and 1954. The compensation arrangement called for setting aside from each year’s profits either $30,000 or 6 percent of the company’s net worth, whichever was greater, before any compensation would be payable to Irby Junior. Profits in excess of this quota would be divided, 60 percent to Irby Junior, and 40 percent to the corporation, provided that such division would only be applicable to the time Irby Junior was actively engaged in the business. The proviso was inserted because of the contemplated absence of Irby Junior during parts of 1953 and 1954. During the absence of Irby Junior, the board of directors made the compensation scheme applicable to Irby Senior because he resumed active management of the business for this time.
The corporation achieved record success during the period in question and compensation to the two Irbys was as follows:

1953 195!t

Irby Senior_$25, 000. 00 $84,416. 25
Irby Junior_ 70,727.19 126,110.14
The Commissioner of Internal Kevenue allowed the plaintiff to deduct $50,000 in 1953, and the same amount in 1954 based on a maximum reasonable compensation of $25,000 per year for each of the Irbys. Some $200,000 which the plaintiff actually paid to the Irbys was disallowed as an unreasonable deduction for salary expense. The plaintiff paid the additional assessments resulting from this disallowance and now sues for their refund.
*346 The statutes applicable to the controversy are as follows:
§ 23. Deductions from gross income.
In computing net income there shall be allowed as deductions:
(a) Expenses.
(1) Trade or business expenses.
(A) In general.
All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *. [Emphasis supplied.] 26 U.S.C. (I.E.C. 1939) §23 (1952 Ed.).
The language of the parallel provisions of the 1954 Internal Revenue Code is very similar. 26 U.S.C. (I.R..C. 1954) § 162 (1952 Ed. Supp. II).
There is no definite formula by which the question of the reasonableness of compensation in any particular instance can be determined. It is a question of fact which must be resolved anew in each case. Stiening v. Commissioner, 147 F. 2d 204 (3d Cir. 1945). Yet no one fact can be considered controlling to the exclusion of all others. Ticket Office Equipment Co. v. Commissioner, 20 T.C. 272 (1953), affirmed, 213 F. 2d 318 (2d Cir. 1954). Each situation must be examined as a whole. The issue most often arises, as it does here, in a case concerning a close corporation, where the employees are also stockholders or members of a family controlling the corporation. It is readily apparent that in this situation the question of reasonableness of compensation is inseparably tied to the question of whether the alleged compensation is not really a dividend in disguise.
The inquiry as to the reasonableness of compensation in a given instance is not without some guides. At various times courts have looked to such things as the amounts paid by similar enterprises for services of a like character; the type and extent of services rendered by the employee; the scarcity of qualified employees for the position; the prior earning capacity of the employee; the peculiar characteristics of the taxpayer’s business, and the general economic conditions of the period. See Mertens, Law of Federal In *347 come Taxation, Sec. 25.69 (1960). Evidence on each of these points is in the record. But even with these fragments of information in our possession there is no jig available that readily assembles the answer.
The plaintiff urges us to give great weight to the fact that various companies, particularly partnerships, in competition with the plaintiff paid salaries to their managing executives in amounts up to 50 percent of the profits. The average amount of compensation appears to have ranged from 40 to 50 percent of the profits in similar instances. It is uncertain to what extent the share of a partner in the profits of a partnership may be compared to the salary of a corporation employee who is also a large stockholder in the corporation. But in any event, the record shows no company which paid compensation of 60 percent of the profits to a partner or an employee as was done by the plaintiff in the instant case. The plaintiff maintains that this high percentage is justified because of the additional risks accepted by the Irbys. Under the terms of the agreement the Irbys received no salary until the corporation had earned $30,000, and even when that point was reached the Irbys were guaranteed no minimum salary.
The fact that the aggregate amount of compensation is based upon a contingency is an element tending to show reasonableness, James J. McHale Co. v. United States, 151 F. Supp. 115 (N.D. Ohio 1957); but since the percentage arrangement of determining compensation readily lends itself to a means of distributing or sharing profits it must be tested with that possibility in mind. Consolidated Apparel Co. v. Commissioner, 17 T.C. 1570 (1952), affirmed on this point, 207 F. 2d 580 (7th Cir. 1952). Even a payment that is reasonable is not deductible if it was actually a distribution of earnings as contrasted with compensation for services rendered. Klamath Medical Service Bureau v. Commissioner, 29 T.C. 339 (1957), affirmed, 261 F. 2d 842 (9th Cir. 1958). Furthermore, a bonus-type contract which is reasonable with a nonstockholder employee may be unreasonable if made with a large stockholder since the incentive of the bonus would presumably not be needed to call forth the stockholder’s best efforts. City Chevrolet Co. v. Commissioner, 228 F. 2d 894 (4th Cir. 1956).
*348 We have weighed all the elements which bear on this controversy, and we conclude that the maximum reasonable compensation which the plaintiff might have paid its managing executive for the years in question and deducted for income tax purposes is as follows:

195S 195J,

Irby Senior_$25, 000 $55,200
Irby Junior_ 47, 200 75, 000
The plaintiff is entitled to recover, with interest as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c).
It is so ordered.
Durfee, Judge; LaRamoee, Judge; Madden, Judge; and Whitaeer, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
1. (a) Stuart C. Irby began his business career in 1908, at age 19, as an employee of a public utility company. During the next 11 years he worked in the commercial and sales department of the company, and gained some experience in the building of electric power distribution lines.
(b) In 1919, he and a partner established a business of their own in Jackson, Mississippi, to build electric distribution systems for towns in Mississippi and for the wholesaling of electrical supplies. In 1924, the partner took over the wholesale business, while the newly formed Stuart C. Irby Company acquired the construction business. Stuart C. Irby was the manager and principal stockholder of the Stuart C. Irby Company.
(c) In time the Stuart C. Irby Company reentered the business of wholesaling electrical supplies and entered the field of contracting for the inside installation of electric wiring. The latter phase of the business was discontinued in 1939.
(d) The plaintiff corporation, Irby Construction Company, was organized in 1946, as a device for severing the construction business from the wholesale supply business. *349 The severance was effected by an exchange of construction equipment owned by the Stuart C. Irby Company for 72,545 shares of the capital stock of the Irby Construction Company, valued on issue at $1 per share.
(e) Stuart C. Irby was the manager and principal stockholder of the new corporation. Other stockholders were substantially the same as in the Stuart C. Irby Company. Among the incorporators of plaintiff was Irby’s son and namesake, Stuart C. Irby, Junior. Father and son are hereinafter designated as Irby Senior and Irby Junior.
(f) In 1946, when the Irby Construction Company was incorporated, Irby Senior was 57 years old. His son was 22, and had just resumed his college courses after an interruption of 2 years for war service.
(g) By 1946, the construction of power distribution and transmission lines[1] had acquired the specialized name of pole line construction, to distinguish its unique place in the construction industry. The future of pole line construction was then quite promising, by virtue of the program of the Bural Electrification Administration (hereinafter designated as BEA). Irby Senior hoped that his son would enter and eventually take over the pole line construction business, and Irby Junior had evinced some interest in doing so.
2. (a) The BEA was created in 1935 and began the financing of power line construction in 1936. Prior thereto, power distribution and transmission lines were built by utility companies, sometimes under contract with a construction company, but usually on a force account basis. The development of the BEA program required the services of many independent contractors. The fillip of the BEA program therefore stimulated the growth of a new, specialized industry, known as pole line construction and characterized by the formation of numerous small business enterprises.
(b) While rural electrification made progress between 1936 and 1941, the program was far from complete when the war intervened and virtually brought it to a halt. When *350 tbe war ended, the program was resumed. Pole line construction proved inviting to many returning servicemen, as providing opportunity for profitable enterprise with the use of relatively small amounts of risk capital. Projects were plentiful during 1946,1947, and, 1948.
(c) The risk proved to be greater than anticipated in many instances, because of the high standards, close supervision, and tight requirements of EEA. The ranks of pole line constructors were steadily thinned. By 1950, when the volume of work had begun noticeably to decline, competition in the bidding of contracts was intense, and was more and more confined to a relatively small group of contractors who had proved their competence in the rough school of experience.
(d) The Irby Construction Company was outstanding among the survivors. Irby Senior had established for himself and his company a wide and enviable reputation for competence and integrity. The Irby Construction Company encountered no difficulty in meeting the bonding requirements of EEA contracts (which called for 100 percent guarantee), and was able at all times to maintain an open line of credit. In extending credit, bankei’s had, come to rely as much upon the proven competence of the borrower as upon the collateral required to support the loans.
3. (a) By 1950, the pattern of EEA operations was well established. Local groups organized themselves into cooperatives or public utility companies pursuant to standards requisite for the borrowing of funds from EEA. When the project had been defined, the borrower (hereinafter called owner) employed a consulting engineer who (1) prepared the plans and specifications; (2) made estimates of cost; (3) invited bids; (4) analyzed the bids received and made recommendations thereon to the owner and to EEA; (5) prepared the contract (the ultimate execution of which by the owner was subject to approval by EEA) ; (6) assisted the owner in obtaining rights-of-way; (7) staked out the lines to be built, providing the contractor with the staking sheets; (8) supervised the contractor’s work, acting as resident engineer for the owner; and (9) represented the owner in closing out the contract with the contractor.
*351 (b) Invitations for bids on REA projects were attached to bid-book forms wherein were listed all of the items to be installed, together with the requirements of installation. Occasionally the owner elected to furnish some of the items, but generally all materials as well as the labor were to be supplied by the contractor. Prospective bidders were able to make up their bids by (1) ascertaining the prices at which the various specified items could be obtained; (2) adding to such prices the labor costs of installation; (3) multiplying unit costs so obtained by the number of items; (4) adding the group costs; and (5) adding allowances for overhead, contingencies, and profit.
(c) By 1950, the bid-book form of bidding had so refined the processes of bidding on REA-financed contracts as to require the services of a specially qualified executive (1) to submit a successful bid and (2) to perform the contract so obtained at a profit. In succeeding years, as the volume of power line contracts declined, the competition between prospective bidders to obtain work became more intense, and the need all the greater for the services of an executive possessing the requisite expertise.
4. (a) In 1951, there was established, under the aegis of REA, the Rural Telephone Administration (hereinafter called RTA), to promote the extension of rural telephone lines in the same manner as REA had promoted the extension of electric power lines into rural communities.
(b) The RTA program was slow starting. With all of the experience of REA behind it, the added complexities of telephone installations (switchboards, local exchanges, and some underground cable) proved administratively indigestible for a time. Difficulties were encountered (1) by RTA in standardizing requirements; (2) by local owners in obtaining the services of qualified consulting engineers; (3) by the consulting engineers who did qualify in obtaining clearances from RTA; and (4) by the contractors (a) in mastering the complexities of the installations and (b) in accommodating to the delays in performance resulting from administrative confusion.
(c) Those contractors who mastered the complexities of telephone installations found in the RTA program, during *352 the years material here (1952-1954), a welcome source of additional and profitable employment for their organizations. The Irby Construction Company undertook and successfully performed the first of the BTA contracts in the southern region, and was thereafter a leader in the field.
5. (a) By 1950, the pattern of success in the pole line construction industry in the Southern States[2] was well established. Each contracting organization had to have risk capital and financial credit sufficient to perform its contract or contracts. (The dollar volume of the contracts ranged from $70,000 to $800,000, with an average of approximately $200,000.) The key to success was then uniformly and firmly held by one man, who can best be described as the managing executive.
(b) The managing executive was responsible (1) for the selection of projects to bid; (2) for the preparation and submission of successful bids; and (3) for the successful performance of the contract or contracts awarded.
(c) Among the ingredients requisite to successful performance, the most important were efficiency in progress and timely completion. Time was money, in a literal sense. The contractor was bound to respond in liquidated damages for delay in completion chargeable to his fault, while excusable delay (even if caused by the owner) would net him nothing more than a time extension. Smooth, efficient work progress netted the contractor economies in labor costs.[3] The managing executive was responsible for the selection and employment of the labor force, including the designation (and training, if required) of foremen and superintendents. He was likewise responsible for the over-all layout of the project, the selection, purchase, assembly and dispatch of supplies and equipment, overall supervision, and constant watch over progress.
(d) Keliance upon the loyalty, competence, and efficiency of work crews became an important element in the compu *353 tation of labor costs per unit, which., in turn, often made the difference between success and failure in the submission of bids. Cost estimates required consideration of time as well as wages. The managing executive therefore had to visit the site of ,a prospective contract to survey (1) the local labor supply; (2) transportation and housing needs and facilities; (3) weather conditions; (4) requirements of the terrain in terms of delivering supplies and equipment, digging postholes, and stringing wires; and (5) the organizational efficiency of the owner, including the experience and temperament of the consulting engineer ,and the extent to which rights-of-way problems had been solved.[4]
(e) In sum, a successful managing executive had to be an expert analyst in the selection of potential projects and in the preparation and submission of bids, and an efficient expediter in the performance of the work. The demands upon his time and energy were in direct ratio to the volume of work undertaken. If he essayed a substantial volume, he would often have to travel long distances by day, pore over paper work in his office or hotel room by night, call and be on call at all hours, day and night, every day in the week.
6. (a) Forms of business entities varied among the pole line constructors. Initially, there were many sole proprietors conducting one-man operations. Many of the postwar businesses came into being as partnerships, with one man furnishing the risk capital while the other partner served as managing executive. Some of the companies were incorporated. Whatever the form of the entity, the components of an operating unit were always the same: risk capital and a managing executive.
(b) Uniformity also appeared in the pattern of compensation of the managing executive. In the usual case of a partnership, where one man supplied the risk capital and the other supplied energy and talent, the two men would divide *354 tbe profits. Where the business entity was given a corporate form, the method of compensation was somewhat different. The managing executive would usually receive a fixed salary plus a commission or bonus; his total compensation might range as high as 40 to 50 percent of the profits.
7. (a) Irby Junior completed his college courses in January 1948, and immediately joined his father in the business of the Irby Construction Company. His age at the time was 24, while his father was 59. Irby Senior promptly set about to teach his son the business in all of its ramifications.
(b) Young Irby had put in three summers, during his high school years, working as a laborer with crews in the field. With this experience as a foundation, he served his apprenticeship as learner to master craftsman in each of the other phases of the business.
He started in the office, learning the routine of filing, conducting correspondence, channeling items for accounting, and general office management. He assembled cost data of equipment and supplies for use in the preparation of bids and for review in the closing of contracts. He worked with his father in the preparation of bids.
He went into the field, took part in actual operations, conferred with workmen, foremen, and superintendents employed by his company and with the consulting engineers of owners. In time, he worked with consulting engineers in the closing out of contracts, and went with his father, and then alone, to make field surveys of projects under consideration for bidding. Ultimately, he undertook the preparation and submission of bids, first with and then without consultation with his father. Meanwhile, he was assuming more and more responsibility for the supervision of work in the field.[5]
(c) Irby Junior was first permitted to try his skill, on his own, in the preparation and submission of bids, in 1949. Dur *355 ing the next year, 1950, competition in the pole line construction industry was keener than ever. In his eagerness to secure contracts, Irby Junior relaxed his caution somewhat. He thereby won the award of two contracts in south Missouri but lost money in the performance of them. The experience was painful but valuable. He proved his competence thereafter by successful bidding and profitable performance.
8. (a) Meanwhile, ownership of the Irby Construction Company was maintained, in preponderant ratio, by the Irby family. Table 1, which is incorporated in this finding, reflects the stock ownership during the years 1950-1954. Throughout this period, shares owned by Irby Senior, his son and his daughter and his grandchildren, accounted for more than 70 percent of the shares outstanding.[6]

*356 (b)Both Irbys drew salaries in 1950, 1951, and 1952, as follows:

The $11,000 increase for each of the Irbys in 1952 represented permissive increases under applicable salary stabilization regulations in force at the time.
(c)The Irbys’ compensation in 1953 and 1954, hereinafter explained, was as follows:

(d)The growth of the company during the 5-year period, 1950-54, is reflected in table 2, while the operating results, from the standpoint of the stockholders, are shown in table 3. Both tables are incorporated herein by reference.
Following are percentages (1) of gross profits to sales and (2) of net earnings (before Irby compensation, profit-sharing fund, and taxes) to gross profits.

*357

(e) Table 4, incorporated in this finding, reflects the ratios to net earnings (before taxes, profit-sharing fund, and

*358 Irby’s compensation) of (1) total compensation paid to both Irbys; (2) compensation paid to Irby Senior; and (3) compensation paid to Irby Junior.
9. (a) Irby Junior carried the load as managing executive of the Irby Construction Company in 1952. Operating results for that year demonstrated his competence to assume full responsibility for the management of the company. While sales for that year exceeded the average of the sales in 1950 and 1951 by 8.6 percent, gross profit for the year was almost double and net earnings for the year (before compensation, profit-sharing, and taxes) were more than double the averages for the two preceding years.
(b) During the closing months of 1952, three plans on which Irby Junior had been working for some time came to fruition. One was a plan for sharing the profits of the company with the employees; one was a plan for basing his own compensation on a profit-sharing arrangement; and one was a plan for him to undertake graduate study.
10. (a) The employee profit-sharing plan was made effective for the year 1952. At the end of the year, the sum of $14,753.04 was set aside for distribution under the plan. In 1953, the amount set aside was $17,466.65, and in 1954 the amount was $24,677.67.
(b) The employee profit-sharing plan represented a synthesis of practices developed by various businesses, adapted to the purposes of the Irby Construction Company. Details of the plan are not in evidence, beyond the facts that (1) the amount set aside reflected a percentage of profits; (2) distribution was governed by a point system based on length of service and earnings; and (3) both Irbys, father and son, participated, in the plan.[7]
(c) The purpose and effect of the employee profit-sharing plan was to enhance the incentive of the participants toward loyalty to the company’s interests, such loyalty being reflected in more efficient performance of their duties. Results are evident in the increased ratios (as shown in finding 8 (d)) of gross profits to sales and of net earnings to gross profits.
11. (a) The plan for compensating Irby Junior on the *359 basis of a percentage of profits in lieu of salary was agreed upon, as between father and son, in December 1952; it was formally adopted by the company’s board of directors, without dissent, in February 1953,[8] immediately upon the lifting of the restrictions of salary stabilization; and it was effective, by agreement, during the years 1953 and 1954.
(b) The compensation arrangement called for setting aside from each year’s profits either $30,000 or 6 percent of the company’s net worth, whichever was greater, before any compensation would be payable to Irby Junior. Profits in excess of this quota were to be divided, 60 percent to Irby Junior, and 40 percent to the corporation, provided that such division should be applicable only to the time Irby Junior was actively engaged in the company’s business.[9]
(c) During 2 years, more or less, before the foregoing compensation arrangement was approved, Irby Junior had been urging upon his father the desirability of a compensation plan for himself based upon a percentage of profits. He knew that many of the managing executives of construction firms in competition with Irby Construction Company were so compensated, receiving as high as 40 to 50 percent of the profits. He knew that these men were so compensated as an incentive to hard work and successful performance, and he wanted, and thought he was entitled to, a similar incentive.
(d) During 1950 and 1951, Irby Senior had given serious consideration to liquidating the Irby Construction Company. He was growing older, the competition in the power line work was growing sharper, the volume of such work within moderate range of his home was growing ever smaller, and the risks in new territory, farther and farther away, were growing greater. The value of the shares of the Irby Construction Company had increased almost fivefold. By liquidating the company and reinvesting the assets in safe, income-producing securities, he could have been assured of a modest competence.
*360 (e) Irby Junior, meanwhile, considered the possibility of going into business for himself. In 1951, he organized a corporation for the purpose, but took no steps to activate it.
(f) Father and son discussed their aims and ambitions between themselves. There was no disagreement. Each recognized and appreciated the other’s point of view. Irby Senior was approaching retirement age. Security had more attraction for him than did the prospect of bigger returns at the risk of security. Irby Junior had the full vigor of youth. He was competent and self-confident. He wanted to make money, and had no hesitancy in assuming the risks inherent in the undertaking.
(g) The ultimate agreement between them reflected the results of their discussions. Irby Senior decided to leave his capital in the company, and to risk it on his son’s terms. Irby Junior got his father’s approval of the incentive compensation plan, and retained the advantage of the company as a going concern, including its good will, which, in itself, was an asset of considerable value.[10]
12. (a) The third of Irby Junior’s plans to receive approval in 1952 was his personal ambition to pursue graduate study. After considering Harvard, then Princeton, his interest centered on a graduate course on international relations to be given in Geneva, Switzerland, beginning in September 1953, and continuing into May 1954.
(b) It was agreed, initially, between father and son, that Irby Junior would forego the graduate study unless, by the time for his departure, the affairs of the company were in such condition as to permit his absence, and that, if he carried the study plan through, Irby Senior would take over the duties of the managing executive during his son’s absence. This was the plan approved by the company’s board of directors in February 1953, when the incentive compensation *361 scheme was made applicable to the time that Irby Junior was actively engaged in the business.
(c) By September it was apparent that Irby Junior had placed upon the books of the company enough new business to keep the organization well occupied during his absence. Irby Senior was willing and able to perform the duties of the managing executive during such absence. Irby Junior thereupon proposed to the board of directors that the incentive compensation scheme be made applicable to Irby Senior during the absence of Irby Junior. Irby Senior, however, elected to receive his fixed salary in 1953, but expressed willingness to accept the percentage arrangement for such portion of 1954 as Irby Junior should be absent, such compensation to be in lieu of fixed salary. The board of directors voted accordingly.
13. (a) Irby Junior left for Geneva during the latter part of September 1953. Before his departure he had completed the organization of projects then on hand as far as he could. His father then took over.
(b) Sales for the year 1953 totaled $3,639,679.12, being 26.88 percent greater than the total sales for 1952. The bulk of these sales was made by Irby Junior before his departure.
(c) Gross profits for the year 1953 were 11.48 percent greater than for 1952, while net earnings (before compensation, profit-sharing, and taxes) for 1953 were 9.62 percent greater than in 1952. Irby Senior’s efforts contributed to these favorable results, as did those of Irby Junior.
(d) The compensation of Irby Junior, for the year 1953, was computed and paid by the company in the amount of $70,727.19, as recorded in finding 8(c). The amount represents %2 °f 60 percent of the year’s profits[11] after deduction of the $30,000 quota.
14. (a) Irby Junior returned from Geneva and resumed his duties with the company in late May 1954. His father had carried on during the son’s absence.
(b) Sales for the year 1954 totaled $3,169,691.30, being 12.88 percent less than the total sales for 1953, but 10.50 *362 percent greater than the sales for 1952. The bulk of the 1954 sales was made by Irby Junior after his return.
(c) Gross profits for the year 1954 were 57.31 percent greater than for 1953 (and 75.40 percent greater than for 1952), while net earnings (before compensation, profit-sharing, and taxes) for 1954 exceeded those of 1953 by 76.76 percent (and those of 1952 by 93.79 percent). The efforts of both Irbys contributed to these favorable results.
(d) The compensation of the Irbys for 1954 was computed and paid by the company in the amount of $210,-526.39, as recorded in finding 8(c). The amount represents $3,500 more than 60 percent of the year’s profits after deduction of the $30,000 quota. The excess is not explained by the evidence.
(e) The 1954 compensation was divided between the Irbys on the basis of 4.8 parts (of 12.) to Irby Senior and 7.2 parts to Irby Junior, representing the portions of the year that each was in charge. The dollar amounts, as shown in finding 8(c), were: to Irby Senior, $84,416.25; and to Irby Junior, $126,110.14.
15. (a) The plaintiff corporation kept its books and filed its income tax returns for the calendar years 1953 and 1954 on the accrual basis.
(b) Within the time required by law, plaintiff filed with the Director of Internal Eevenue at Jackson, Mississippi, its income tax returns for the calendar years 1953 and 1954, disclosing tax liabilities in the amounts of $42,000.82 and $65,736.59, respectively. Timely payments of these liabilities were made to the Director at Jackson.
(c) The Commissioner of Internal Eevenue thereafter assessed deficiencies against plaintiff for the years 1953 and 1954 in the amounts of $23,843.14 and $83,473.86, respectively.
(d) The deficiencies resulted from the disallowance, in part, by the Commissioner of Internal Eevenue of deductions of compensation paid to Irby Junior in 1953 and 1954 and to Irby Senior in 1954. The deductions were made by plaintiff as ordinary and necessary business expenses. The compensation paid and deducted, the amounts allowed, and the amounts disallowed were as follows:

*363

(e) Plaintiff paid the deficiencies for 1953 and 1954 totaling $107,317.00, together with $15,370.17 interest thereon, to the Director in Jackson on June 7, 1957. Additional interest in the amount of $417.13 was paid to the Director on July 5,1957.
(f) Timely claims for refund for the years 1953 and 1954 were filed by plaintiff on July 15, 1957. The Commissioner of Internal Eevenue disallowed and rejected these claims by registered, letter dated July 16, 1957. Petition was filed in this court on August 26,1957.
16. (a) The intent and purpose of the initial agreement between the Irbys (father and son) in December 1952, and between Irby Junior and the company in February 1953, as presented by the evidence, was that the corporation would, receive (1) the first $30,000 of earnings plus (2) 40 percent of the remainder, and that it would pay over to Irby Jimior 60 percent of what remained after provision had been made for the $30,000 of quota-earnings.
(b) The division of 60-40, instead of the more common pattern of 50-50, was justified in the testimony of both Irbys on the ground that the quota-earnings were to be set aside before Irby Junior would receive any compensation whatever. The quota-earnings plus the company’s 40 percent of the remainder were intended to balance out the 60-40 *364 division against the more usual pattern of a 50-50 division. The earnings quota was portrayed as being in the nature of an assured return of 6 percent or better on the net worth of the company before division of further profits between the company and Irby Junior.
(c) In the application of the compensation formula, pursuant to the agreement as portrayed in the evidence, amounts set aside from earnings for profit-sharing among the employees should have been treated, as between the company and Irby Junior, as an expense of doing business.[12]
17. The compensation formula described in finding 11 was agreed upon before the services were performed, for 1953 [13] as well as 1954.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover with interest thereon as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Eule 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on November 9, 1961, that judgment for plaintiff be entered for $61,064, together with interest thereon as provided by law.

 The distinction in the trade between distribution lines and transmission lines was in the voltage, bigb voltage lines being known as transmission lines, while lower voltage lines carrying power to individual consumers were known as distribution lines.

 The evidence in the case relates primarily to construction firms operating in the Southern States. Such evidence as there is of operations in other sections indicates no variance there from the pattern here described.

 The efficient use of labor was more important than any other one factor in profitable performance.

 Contract forms approved by REA gave no protection to the contractor for the owner’s failure to complete provisions for rights-of-way. In practice, contractors often encountered misunderstandings with landowners. As a result, the contractor’s managing executive was frequently called upon to serve as a public relations man between the owner of land and the owner of the project.

 Irby Senior found bis son eager to assume responsibilities and to make decisions. Tbe transfer of responsibilities from father to son moved faster than might otherwise have been the case because of the eagerness of Irby Junior and because of health problems of his father and mother. Irby Senior was troubled with ulcers, while his wife was an invalid and spent many months in hospitals, part of the time in Memphis and part of the time in Connecticut. Irby Senior was frequently absent from the business for short periods because of his wife’s illness during 1948 and 1949.

 During each of the years in question, Irby Senior made gifts of shares in the company to his son and daughter or to his grandchildren. Meanwhile, Irby Junior purchased some shares from other owners.

 For 1953 and 1954, earnings eligible for point credits were limited to $25,000. Tills action, was taken on motion of Irby Junior.

 All concerned were aware of tlie fact that if the arrangement had been In effect In 1952, the compensation of Irby Junior for that year would have been in excess of $80,000.

 The proviso was inserted because of the contemplated absence of Irby Junior during parts of 1953 and 1954, hereinaftei described.

 The evidence is relatively barren of details concerning the operations and earnings of the Irby Construction Company’s competitors. Efforts by the Irbys to obtain such information for use as evidence in this case were unavailing. Several of the competitors testified, however. They were uniform in expressing (1) high regard for the Irbys, individually; (2) respect for the Irby Construction Company as a competitor; and (3) surprise, almost to the point of amazement, at the financial results of the Irby Construction Company’s operations, which were disclosed to them for the first time at the trial.

 The year’s profits were computed by deducting the salary of Irby Senior ($25,000) from the net earnings (as recorded in column 4 of table 2).

 Failure to treat the profit-sharing allowances in this manner had the effect of channeling from half to four-fifths of the quota-earnings into the profit-sharing allowances and away from returns on invested capital.

 Defendant’s contention that January and half of February 1953 should be excluded because formal action by the board of directors was not taken until February 16, 1953, is technical. Agreement had been reached, prior thereto, by all concerned. Moreover, formalization was deferred pending the anticipated expiration of salary stabilization requirements, which occurred just 10 days before the board action.