Arthur K. WHITCOMB and Lena R. Whitcomb, Arthur Whitcomb, Inc. and Subsidiaries, Petitioners, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee.

No. 83–1847.

United States Court of Appeals, First Circuit.

Argued April 6, 1984.

Decided May 10, 1984.

Chester M. Howe, Boston, Mass., with whom Gaston Snow & Ely Bartlett, Boston, Mass., was on brief, for appellants.

Joan I. Oppenheimer, Atty., Tax Div., Washington, D.C., with whom Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Atty., Tax Div., and Ann Belanger Durney, Atty., Tax Div., Dept. of Justice, Washington, D.C., were on brief, for appellee.

Before BOWNES, ALDRICH and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

Petitioners-appellants, Arthur Whitcomb, Inc., and Subsidiaries (Company), appeal a decision from the United States Tax Court, 81 Tax Court 505 (1983), holding that the Company was not entitled to a deduction for the cost of life insurance premiums on a policy covering the Company's former president, Arthur K. Whitcomb. The Tax Court determined income tax deficiencies of $2,624 and $18,242 for 1974 and 1975 for the Company, and $2,877.52 and $17,115.55 for Arthur and Lena Whitcomb. The individual taxpayers, Arthur and Lena Whitcomb, have conceded tax liability and the only issue is the Company's liability.

The issue on appeal is whether the Tax Court erred in finding that the premiums the Company paid for term life insurance on Arthur Whitcomb after his retirement were not compensation for services to the Company and, therefore, not deductible.

We affirm.

*The Facts*

The Company originated in 1946 when Whitcomb formed Arthur Whitcomb, Inc., naming himself president and treasurer. Arthur Whitcomb, Inc., is a general management company, overseeing other corporations formed by Whitcomb in New Hampshire and Vermont. These corporations produce and sell building supplies, sand, gravel, concrete, and concrete building blocks, as well as rent heavy construction equipment. Some of the corporations were Arthur Whitcomb, Inc., subsidiaries while others were affiliates.

In 1974 and 1975, the common stock of the Company was owned exclusively by members of the Whitcomb family who held, directly, or indirectly, the stock of the other corporations in approximately the same proportions as they did the parent company holdings.

At age sixty-four, in October, 1971, Arthur Whitcomb retired from the Company with a $21,000 annual pension. After his retirement, Whitcomb spent about six months a year in Florida, where he operated Miramar Lakes, Inc., a sand and gravel business he started in 1971 or 1972. For the years 1972 through 1975, the remaining six months were spent in New Hampshire working for the Company. James Wirths, comptroller of the Company, testified that during this time Whitcomb was very active in the Company, shouldered the same responsibilities that he had carried prior to his retirement, was still considered the boss despite the fact that his son, Robert, had been president of the Company since 1971 and that Arthur Whitcomb's services were worth $40,000 a year to the Company. Whitcomb was not carried on the books as an employee, nor was he ever paid any salary after his retirement.

Prior to Whitcomb's retirement, the Company initiated a group term life insurance plan for its active, full-time employees, which was in effect from December 27, 1968, to November 1, 1974. The Company purchased the insurance policy from Mutual Benefit Life Insurance Company. Whitcomb was not covered under this insurance plan.

In 1973, the Company determined that on Whitcomb's death his estate tax liability would be approximately one million dollars, and realized that his estate would not have the liquidity necessary to pay the estate tax. It, therefore, purchased a separate one million dollar whole life insurance policy on Whitcomb with the Company as the named beneficiary. The annual premium was $69,500. On Whitcomb's death, the Company planned to use the policy proceeds to redeem Whitcomb's stock from the estate thus giving it the funds necessary to pay the estate tax. At no time did the Company claim that this policy was part of the group term plan, nor did it attempt to deduct the premium as a business expense for personal services actually rendered, 26 U.S.C. § 162(a)(1).

In 1974 the Company decided to change its insurance coverage on Whitcomb for three reasons: to reduce the cost of the annual premium; to render the cost of the premiums deductible; and to preclude the amount of the premiums being included as income to Whitcomb. It, therefore, obtained, on November 1, 1974, a one million dollar term life insurance policy from the Provident Life and Accident Insurance Company, designating Whitcomb's son and daughter as the beneficiaries. The change from whole life to term insurance reduced the annual premium from $69,500 to $34,000. By eliminating itself as the designated beneficiary, the Company believed the premium could be deducted because 26 U.S.C. § 264 no longer applied.[1] The Company purported to include the policy in a "Plan of Group Life Insurance for Eligible

---

1. **264. Certain amounts paid in connection with insurance contracts**
    (a) **General rule.**—No deduction shall be allowed for—
    (1) Premiums paid on any life insurance policy covering the life of any officer or employee, or of any person financially interested in any trade or business carried on by the taxpayer, when the taxpayer is directly or indirectly a beneficiary under such policy.

Employees" adopted on November 1, 1974. This would have the effect of eliminating the cost of the premiums as income to Whitcomb under 26 U.S.C. § 79(b)(1).[2]

The plan covered five categories of employees, but Whitcomb was the only employee that qualified under category D, "Active full-time President, or retired President with at least 25 years of service with the Company." All employees, except Whitcomb, were insured by the Paul Revere Life Insurance Company, successor to Mutual Benefit.

On November 19, 1974, Whitcomb assigned all of his interest in the Provident policy to his son and daughter as tenants in common. In November, 1980, the Company cancelled the million dollar term life policy because of the increased liquidity of Whitcomb's assets and the questionability of the deductibility of the premiums by the Company.

*The Deductibility of the Premium Payments*

The question is whether the payment of the 1974 and 1975 term life insurance premiums were deductible under 26 U.S.C. § 162(a)(1)[3] as "compensation for personal services actually rendered." Petitioner makes two arguments: one, that the Tax Court erred in framing the issue in terms of whether the payments were made as an "intent to compensate"; two, that the payments were in fact compensation for services rendered and the Tax Court's finding to the contrary was clearly erroneous.

The regulations and case law interpreting section 162(a)(1) set forth two requirements that must be satisfied before the deduction will be allowed. First the compensation must be intended to be payment for the services performed. Second, it must be reasonable. Treas.Reg. § 1.162–7(a); *see Paula Construction Company v. Commissioner of Internal Revenue*, 58 T.C. 1055, 1058–59 (1972), *aff'd without published opinion*, 474 F.2d 1345 (5th Cir. 1973); *Electric & Neon, Inc. v. Commissioner*, 56 T.C. 1324, 1340 (1970), *aff'd without published opinion*, 496 F.2d 876 (5th Cir.1974); *Drexel Park Pharmacy, Inc. v. Commissioner of Internal Revenue*, 48 T.C.M. (P–H) ¶ 81,416 at 79,2096 (T.C.1981). Only the first requirement is at issue here.

Petitioner cites no cases holding that "intent to compensate" is not the key factor in determining whether the payments were made as compensation for personal services actually rendered. It seems to argue that intent should only be considered where the taxpayer erroneously characterizes the payments and then claims they were for compensation. The law is otherwise:

It is now settled law that only if payment is made with the intent to compensate is it deductible as compensation. *Charles McCandless Tile Service v. United States*, [191 Ct.Cl. 108] 422 F.2d 1336, 1339 (Ct.Cl.1970); *Northlich, Stolley, Inc. v. United States, supra* [177

**2.** **§ 79. Group-term life insurance purchased for employees**

    (a) **General rule.**—There shall be included in the gross income of an employee for the taxable year an amount equal to the cost of group-term life insurance on his life provided for part or all of such year under a policy (or policies) carried directly or indirectly by his employer (or employers); but only to the extent that such cost exceeds the sum of—

        (1) the cost of $50,000 of such insurance, and

        (2) the amount (if any) paid by the employee toward the purchase of such insurance.

    (b) **Exceptions.**—Subsection (a) shall not apply to—

        (1) the cost of group-term life insurance on the life of an individual which is provided

under a policy carried directly or indirectly by an employer after such individual has terminated his employment with such employer and either has reached the retirement age with respect to such employer or is disabled (within the meaning of section 72(m)(7)).

**3.** **§ 162. Trade or business expenses**

    (a) **In general.**—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

        (1) a reasonable allowance for salaries or other compensation for personal services actually rendered[.]

Ct.Cl. 435, 368 F.2d] at 278 [1966]; *Irby Construction Co. v. United States,* [154 Ct.Cl. 342], 290 F.2d 824, 826 (Ct.Cl. 1961); *Electric & Neon, Inc., supra* at 1340; *Klamath Medical Service Bureau,* 29 T.C. 339, 347 (1957), affd. 261 F.2d 842 (C.A. 9, 1958), certiorari denied 359 U.S. 966 [79 S.Ct. 877, 3 L.Ed.2d 834] (1959); *Twin City Tile & Marble Co.,* 6 B.T.A. 1238, 1247 (1927), aff'd. 32 F.2d 229 (C.A. 8, 1929). Whether such intent has been demonstrated is a factual question to be decided on the basis of the particular facts and circumstances of the case. *Electric & Neon, Inc., supra at 1340.*

*Paula Construction Company v. Commissioner of Internal Revenue,* 58 T.C. at 1058–59. We reject petitioner's argument that because Whitcomb rendered valuable services to the Company during the years in question, it should be allowed to deduct the premium payments as compensation for the services, even though it did not evince an intent to compensate Whitcomb at the time the payments were made.

■ We now turn to the factual issue, whether the evidence establishes that the premium payments were by intent and in fact compensation for services rendered. Our analysis is made in light of the long established principle that the Commissioner's "ruling has the support of a presumption of correctness, and the petitioner has the burden of proving it wrong." *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933).

There is no question that Whitcomb rendered valuable services to the Company after his retirement in 1971. The testimony of Wirths, the Company's comptroller, was that Whitcomb's "level of activity" for the Company during the period 1971 through 1975 was about the same as in the years preceding his retirement. Whitcomb, however, was not carried on the books of the Company after 1971 as an employee and was not paid any salary after 1971. The Company made no attempt to compensate Whitcomb for his services in the years 1972 and 1973. It must be borne in mind

that the Company was wholly owned by the Whitcomb family. His son had succeeded him as president. It can be fairly inferred that Whitcomb continued to work for the Company after retirement to insure its ongoing vitality, not for remuneration for himself. The Tax Court was entitled to accept the comptroller's testimony. Asked whether there was a change in Whitcomb's compensation as a result of his retirement, he said, "That was his last year being compensated. Once he retired, he started to draw his formal pension checks."

■ It cannot be doubted that the only purpose for the 1973 insurance was to provide Whitcomb's estate with the funds necessary to pay the estate tax that would be due on Whitcomb's death. By meeting the liquidity problem of Whitcomb's estate, the Company was protecting itself against the sale of at least part of its assets. It is true that the insurance coverage was changed in 1974 in order to reduce the premiums, and attempt to make them deductible to the Company and nontaxable to Whitcomb. The main purpose of the insurance coverage, however, was to provide liquidity to Whitcomb's estate. This is shown by the fact that the life insurance was cancelled in 1980 when liquidity was no longer a problem.

■ It is significant that the records of the Company are devoid of any indication of an intent to compensate Whitcomb for services rendered by paying the insurance premiums. Lack of corporate authorization of compensation is a salient factor in determining intent to compensate. *Champion Trophy Mfg. Corp. v. Commissioner of Internal Revenue,* 41 T.C.M. (P–H) ¶ 72,250 at 72–1299 (T.C.1972); *C.F. Smith Company v. Commissioner of Internal Revenue,* 23 T.C.M. (P–H) ¶ 54,191 at 594–54 (T.C.1954).

Nor is any intent to compensate evidenced by the Company's attempt to make Whitcomb's policy part of the group-term insurance for all other employees. In the first place, this was aimed at excluding the cost of the premiums from Whitcomb's gross income, *see* 26 U.S.C. § 79(a), not

paying compensation. And secondly, we agree with the Tax Court that Whitcomb's policy was entirely separate from and unrelated to the group-term insurance on the other employees.

We find that the Tax Court did not commit clear error in finding that the insurance premium payments were not deductible to the Company under 26 U.S.C. § 162(a)(1).

*Affirmed.*