**GRIFFIN & COMPANY Inc.**

v.

**The UNITED STATES.**

**GRIFFIN INDUSTRIES, INC.**

v.

**The UNITED STATES.**

Nos. 130–64, 131–64.

United States Court of Claims.

Jan. 19, 1968.

Herbert L. Awe, Washington, D. C., attorney of record, for plaintiffs.

Edward B. Greensfelder, Jr., Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant; Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on December 28, 1966. Plaintiffs accept the commissioner's opinion and findings with respect to "Conduct of Business", "Automobile Expense", "Repairs or Improvements", and "Partial Reserves", and take exception only with respect to the "compensation issue". The parties have filed briefs and the case has been argued orally. Since the court is in agreement with the opinion and recommendation of the commissioner, with minor modifications, it hereby adopts the same as modified as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiffs are entitled to recover portions of the amounts sued for, together with interest as provided by law, and judgment is entered to that effect with the amounts of the recoveries to be determined pursuant to Rule 47(c).

Commissioner White's opinion, as modified by the court with respect to the "compensation issue", is as follows:

The plaintiffs, Griffin & Company, Inc., and Griffin Industries, Inc., seek to recover refunds of income taxes which the Internal Revenue Service collected from the respective plaintiffs pursuant to deficiency assessments for the fiscal years 1959, 1960, and 1961 in case No. 130–64, and for the fiscal years 1960 and 1961 in case No. 131–64.

Since the two cases involve common questions of law and fact, they were consolidated for trial purposes under Rule 47(a).

### The "Conduct of Business" Issue

Upon audit of the 1960 and 1961 income tax returns of Griffin & Company, Inc., and Griffin Industries, Inc., the Internal Revenue Service (among other things) disallowed net operating loss deductions claimed by Griffin Industries, Inc., in the respective amounts of $11,-563.49 for 1960 and $7,938.97 for 1961, disallowed the $25,000 surtax exemption claimed by Griffin Industries, Inc., for each of the years 1960 and 1961, and allocated to Griffin & Company, Inc., income in the respective amounts of $8,-672.62 for 1960 and $44,461.07 for 1961 which had been reported by Griffin Industries, Inc., for those years.

The primary basis for the actions of the Internal Revenue Service referred to in the preceding paragraph was a determination by the administrative agency that Griffin Industries, Inc., was not engaged in the conduct of business as a separate entity during 1960 and 1961, and that it was actually the business activities of Griffin & Company, Inc., which not only earned the income reported on that company's income tax returns for 1960 and 1961, but also earned the income which Griffin Industries, Inc., reported on its income tax returns for those years. The correctness of this administrative determination will be considered in the present portion of the opinion.

Griffin & Company, Inc., and Griffin Industries, Inc., are two Kentucky corporations, with the same principal place of business, 500 Bergman Avenue, Louisville, Kentucky. (For the sake of convenience, Griffin & Company, Inc., will usually be referred to hereafter in the opinion as "G&C," and Griffin Industries, Inc., will usually be referred to as "GI.")

G&C was founded in 1941 by William J. Griffin, who was its chief executive officer and controlling stockholder at all times relevant to this litigation. From the time of its formation, G&C was what is known in the trade as a mechanical contractor. As such, it specialized in producing, and then installing outside its plant at customers' job sites, sheet metal work and related component parts in connection with heating, ventilating, air-conditioning, dust-collecting, and pneumatic conveying systems. G&C sometimes purchased components manufactured by other companies, and utilized them in equipment which G&C had contracted to install for its customers.

Prior to April 1960, G&C, in addition to carrying on the work of a mechanical contractor, also manufactured and sold some sheet metal items that were delivered to customers F.O.B. its plant, and were not installed by G&C outside the plant in its role as a mechanical contractor. These items consisted principally of equipment for the processing of tobacco.

G&C maintained a well-equipped plant in Louisville. It had a staff of clerical employees, a staff of professional engineering employees, a labor force of sheet metal workers, a plant superintendent to supervise the sheet metal workers engaged in the fabrication or manufacture of equipment within the plant, and a construction superintendent to supervise the sheet metal workers engaged in the installation of equipment outside the plant at customers' job sites.

The officers of G&C during the years involved in the present litigation consisted of William J. Griffin, president, Arnold Van Etten, vice president, and William R. Griffin, secretary-treasurer. William R. Griffin was the son of William J. Griffin. Arnold Van Etten was unrelated to the Griffins. William J. Griffin was the controlling stockholder of G&C, but Arnold Van Etten and William R. Griffin were also stockholders in G&C. These three men constituted a majority of the board of directors of G&C.

GI was the successor corporation of Newcomb-Griffin Company, which was formed on October 28, 1955, as a joint venture by Newcomb-Detroit Company and G&C. Newcomb-Detroit Company

was located in Detroit, Michigan. It was a manufacturer and supplier of spray booths, ovens, and other miscellaneous products for finishing systems. Prior to 1955, Newcomb-Detroit Company and G&C had worked together on various projects, with Newcomb-Detroit Company supplying some of the equipment installed by G&C in its role as a mechanical contractor. The two companies agreed in 1955 to pool their know-how and abilities through the formation, as a joint venture, of a new corporation which would carry on business operations primarily in the Louisville area.

The result of the agreement mentioned in the preceding paragraph was the incorporation in October 1955 of Newcomb-Griffin Company, with 2,500 shares of stock. Newcomb-Detroit Company and G&C each contributed $12,500 as capital for the new corporation, and received in exchange all the stock of Newcomb-Griffin Company. Newcomb-Detroit Company received 1,251 shares of the stock, and G&C received 1,249 shares.

Newcomb-Griffin Company was an industrial supplier. It was formed to manufacture industrial ovens, spray booths, flow-coaters, and industrial washing machines.

In August 1957, DeVilbiss Company acquired all the stock of Newcomb-Detroit Company. It was against the policy of De Vilbiss Company to engage in joint ventures with outsiders. Accordingly, Newcomb-Griffin Company, which had been organized as a joint venture by Newcomb-Detroit Company and G&C, discontinued operations after August 1957, except that it finished up some work which was already in progress and it attempted to collect outstanding accounts.

After rather extended negotiations between G&C and DeVilbiss Company, G&C acquired complete control of Newcomb-Griffin Company on October 23, 1959. This was accomplished by Newcomb-Griffin Company paying to DeVilbiss Company $2,831.01 in redemption of the 1,251 shares of stock in Newcomb-Griffin Company theretofore owned by New-

comb-Detroit Company and its successor, DeVilbiss Company. As previously indicated, G&C owned all of the remaining 1,249 shares of stock in Newcomb-Griffin Company then outstanding.

On January 8, 1960, the name of Newcomb-Griffin Company was changed to Griffin Industries, Inc. At the time, this corporation was dormant, and was not engaged in any sort of business activity. It did not have any plant or equipment, and it did not have any employees or labor force. The corporation's only personnel consisted of its officers, William J. Griffin, president, Arnold Van Etten, vice president, and William R. Griffin, secretary-treasurer (i. e., the same officers as G&C); and its only asset consisted of a relatively modest bank account that was left over from the operations of Newcomb-Griffin Company. It had an operating loss carryover, amounting to approximately $20,000, from the previous operations of Newcomb-Griffin Company.

GI remained dormant for a few more months after January 8, 1960. In April 1960, however, GI was reactivated by its officers, William J. Griffin, Arnold Van Etten, and William R. Griffin, who were also the officers of G&C.

Beginning in April 1960 and continuing through the remainder of the time that is involved in the present litigation, both G&C and GI were operated by the same management team, consisting of William J. Griffin, Arnold Van Etten, and William R. Griffin, in the manner subsequently outlined.

If an order or contract was obtained for the fabrication of equipment and its installation outside the plant at a customer's job site, the order or contract was taken in the name of G&C, and the job was performed by G&C.

If an order was obtained for the manufacture of an item or items to be sold F.O.B. the plant, the order was taken in the name of GI. Each order obtained for GI was reflected by a document which was called a "manufacturing order" and which was generally referred to as an "M.O." The information contained on

the face of the M.O. included the item to be manufactured, the name of the customer, the date of delivery, the price, the cost to GI, the dates and amounts of invoices to the customer, and other detailed information. The M.O. also contained, on attached sheets, a detailed listing of all costs, which consisted principally of labor and materials.

Upon receipt of an order for GI, G&C was requested to furnish the labor and materials (except as indicated in the next paragraph) to manufacture the order. The work to be performed by G&C was reflected by a document which was called a "shop order" and which was generally referred to as an "S.O." The S.O. contained a statement of the services to be furnished by G&C for GI, and on attached sheets there was recorded a detailed listing of all the shop labor used in filling the order, as well as any materials which were furnished by G&C in connection with the job.

If an item to be manufactured under an order taken in the name of GI required a component that could not be produced feasibly in G&C's plant, an order for such component was placed elsewhere in the name of GI, and payment for the component was effected out of GI's bank account.

Upon completion of its work for GI on an order, G&C billed GI, by separate invoice, for all direct costs actually incurred by G&C in furnishing the labor to manufacture the particular item for GI, as well as for the cost of any materials furnished by G&C. In addition to these amounts, G&C charged GI an additional amount equal to 100 percent of the cost of labor and materials, this charge being for overhead and profit.

All items produced by G&C for GI were delivered to GI's customers F.O.B. G&C's plant. Invoices to the customers were issued in the name of GI.

The critical question in this portion of the opinion is whether the activities of GI during the fiscal years 1960 and 1961 amounted, in substance, to the carrying on of business by GI. Moline Properties v. Commissioner of Internal Revenue, 319 U.S. 436, 438–439, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943). The Internal Revenue Service has made a negative determination on this question; and if that determination is correct, the Internal Revenue Service was authorized by the tax laws to "unscramble" the situation existing between G&C and GI, so that income reported by GI might be allocated to G&C as the company that was actually engaged in the conduct of the business that produced the income. Alpha Tank & Sheet Metal Mfg. Co. v. United States, 116 F.Supp. 721, 724, 126 Ct.Cl. 878, 884 (1953); Grenada Industries, Inc., 17 T.C. 231, 253 (1951), aff'd 202 F.2d 873 (5th Cir. 1953), cert. den. 346 U.S. 819, 74 S.Ct. 32, 98 L.Ed. 345 (1953).

█ █ In my opinion, the evidence, as previously summarized, shows that GI was a mere corporate shell during 1960 and 1961. It did not have any employees or any plant with which to carry on a substantial business as a manufacturer of sheet-metal products. It is true that GI purported to carry on such a business, in that orders were taken and invoices were issued in the name of GI, but tax consequences are based upon the substance of transactions, and not upon the forms in which they are clothed. Ingle Coal Corp. v. United States, 127 F.Supp. 573, 579, 131 Ct.Cl. 121, 129 (1955), cert. den. 350 U.S. 842, 76 S.Ct. 82, 100 L.Ed. 751 (1955); Juniper Investment Co. v. United States, 338 F.2d 356, 359–360, 168 Ct.Cl. 160, 167–168 (1964); Shaw Construction Co. v. Commissioner of Internal Revenue, 323 F.2d 316, 320 (9th Cir. 1963).

█ The evidence does indicate that G&C and GI maintained separate bank accounts and separate books of account, and that they filed separate Federal and State income tax returns. While these factors, standing alone, might support a finding that the two companies were engaged in the conduct of separate businesses, such factors are not conclusive and they cannot overcome the strong evidence elsewhere in the record showing that the business activities with which we are concerned were conducted, in

substance—and that the income in question was actually earned, in substance—by G&C, since only G&C had the personnel and the assets with which to carry on a substantial business as a manufacturer of sheet-metal products.

In connection with the conclusion stated above, it should be mentioned that the plaintiffs offered oral testimony to the effect that GI was continued in existence for the purpose of facilitating an agreement with the Sheet Metal Workers International Association whereby sheet metal "production" laborers could be employed and used on certain types of work. Sheet metal workers fall within two union classifications—journeymen sheet metal "construction" workers and sheet metal "production" workers. The journeymen construction workers are more highly skilled and receive higher wages than the production workers. Only the highly skilled journeymen construction workers are permitted by the union rules to fabricate and install items that are to be made of sheet metal and installed by the employer outside his plant at customers' job sites. On the other hand, the less skilled production workers are permitted by the union rules to manufacture items that are to be made of sheet metal and sold F.O.B. the employer's plant.

At all times pertinent to this litigation, journeymen sheet metal "construction" workers in Louisville were members of Local Union No. 110 of the Sheet Metal Workers International Association. In 1960, they received a minimum hourly wage of $4.60. The sheet metal "production" workers in Louisville were members of Local Union No. 425 of the Sheet Metal Workers International Association. Their hourly wage in 1960 ranged from $1.70 to $2.85.

Lonnie Gaither was business agent for Local Union No. 110 ("construction" workers) in 1960, and he also acted as business agent for Local Union No. 425 ("production" workers).

G&C has always had a union shop. Being engaged in the mechanical contracting business, it relied before August 1960 on Local Union No. 110 ("construction" workers) to provide not only the laborers needed for the fabrication and installation of equipment that was to be installed by G&C outside its plant at customers' job sites, but also the laborers needed for the manufacture of equipment sold by G&C F.O.B. its plant. The employment of union "construction" workers by G&C during the period prior to August 1960 for all of its jobs, irrespective of whether a particular job involved work of a "construction" nature or work of a "production" nature, was covered by an agreement between Local Union No. 110 and the Louisville Sheet Metal Contractors Association, of which G&C was a member.

G&C was aware that it would be economically beneficial—and G&C wished—to substitute the less expensive "production" workers for the more expensive "construction" workers on jobs where the nature of the work permitted it under the union rules. Prior to October 1959, G&C attempted to obtain a union contract that would permit the company to use sheet metal production workers for the manufacture of items that were to be sold F.O.B. the plant, but was unable to do so.

On August 11, 1960, however, G&C was able to make an agreement with the union which permitted G&C for the first time to employ the less skilled and less expensive members of Local Union No. 425 ("production" workers) in the manufacture of items that were to be sold F.O.B. the plant. This agreement was mutually beneficial to G&C and to the Sheet Metal Workers International Association: it was beneficial to G&C because it reduced labor costs on certain kinds of work; and it was beneficial to the union because it increased the number of gainfully employed members of the union in Louisville. Also, at the time when the labor agreement was made in August 1960, Lonnie Gaither, the negotiating business agent for the union, was concerned over the possibility that G&C's shop might be organized by the competing boiler-makers' union.

Since the labor contract under which G&C employed sheet metal "construction" workers was between Local Union No. 110 and the Louisville Sheet Metal Contractors Association, Lonnie Gaither insisted upon a separate agreement between the union and G&C covering the employment of sheet metal "production" workers by G&C.

After the labor agreement of August 11, 1960 was made, G&C employed and utilized sheet metal "production" workers for the manufacture of items which were sold F.O.B. the plant. G&C continued to employ and utilize sheet metal "construction" workers for the fabrication and installation of equipment that was to be installed outside the plant at customers' job sites. As indicated earlier in this opinion, orders for the fabrication of equipment and its installation outside the plant were being taken at the time in the name of G&C, while orders for the manufacture of items to be sold F.O.B. the plant were being taken in the name of GI, with GI, in turn, engaging G&C to provide the labor and materials necessary for the production of such items.

■ The inference is warranted from the objective evidence in the record that the existence of GI, and its relationship to G&C, lacked real significance with respect to the willingness of the union to enter into the labor agreement of August 11, 1960, authorizing the employment by G&C of "production" laborers on certain types of work. There is nothing in the evidence to indicate that, during the negotiation of the August 11, 1960 labor agreement between G&C and the union, there was even any mention of GI; the labor agreement was made by the union with G&C, and not with GI; it was G&C, and not GI, that employed and utilized "production" laborers pursuant to the agreement; the "production" laborers employed pursuant to the agreement were employees of G&C, and not of GI; they received their work assignments and their supervision from G&C, and not from GI; they worked in a plant and used equipment provided by

G&C, and not by GI; and they received their wages from G&C, and not from GI. This objective evidence outweighs the subjective understanding of witnesses for the plaintiffs that the existence of GI somehow facilitated the obtaining of the labor agreement which permitted the employment of sheet metal "production" laborers by G&C. Cf. Urban Redevelopment Corp. v. Commissioner of Internal Revenue, 294 F.2d 328, 332 (4th Cir. 1961).

■ For the reasons previously given in this portion of the opinion, I believe that the Internal Revenue Service was justified in determining that GI was not, in substance, engaged in the conduct of business as a separate entity in 1960 and 1961 and, accordingly, that GI should not be recognized for tax purposes in 1960 and 1961, and income reported by GI for those years was actually taxable to G&C.

The conclusion stated in the preceding paragraph makes it unnecessary to consider whether, if GI had earned taxable income in 1960 and 1961, it would have been entitled to claim a net operating loss deduction and the $25,000 surtax exemption for each of those years.

### The "Compensation" Issue

It has been previously mentioned that the three officers of G&C during the years involved in the present litigation were William J. Griffin, president, Arnold Van Etten, vice president, and William R. Griffin, secretary-treasurer. William J. Griffin was the controlling stockholder of G&C, and the other two officers were also stockholders. These three men constituted a majority of G&C's board of directors. There were two other members of the board in 1960, Mrs. William J. Griffin and Ray Heil. In 1961 Mrs. William J. Griffin was the only other member of the board in addition to William J. Griffin, Arnold Van Etten, and William R. Griffin.

William J. Griffin received a salary of $15,000 per year in 1960 and 1961. Arnold Van Etten received an annual salary of $9,600 in 1960 and 1961.

William R. Griffin received a salary of $8,400 in 1960 and a salary of $8,850 in 1961.

Pursuant to actions by G&C's board of directors, William J. Griffin, Arnold Van Etten, and William R. Griffin each received $25,000 during the fiscal year 1960 and $27,500 during the fiscal year 1961, in addition to the salaries paid to these individuals during the respective years. Such additional amounts were stated in the minutes of the meetings of the board of directors to be bonuses.

Upon audit of G&C's income tax return for the fiscal year 1960, the Internal Revenue Service determined that $27,500 of the amount paid to Arnold Van Etten and $20,000 of the amount paid to William R. Griffin as compensation during that year constituted reasonable compensation and had been properly deducted as business expenses by G&C, but that $7,100 of the amount paid to Arnold Van Etten and $13,400 of the amount paid to William R. Griffin did not constitute reasonable compensation and could not properly be deducted by G&C.

Upon audit of G&C's income tax return for 1961, the Internal Revenue Service again allowed $27,500 of the amount paid to Arnold Van Etten and $20,000 of the amount paid to William R. Griffin as reasonable compensation and thus deductible by G&C, but held that $9,600 of the amount paid to Arnold Van Etten and $16,850 of the amount paid to William R. Griffin in 1961 did not constitute reasonable compensation and could not properly be deducted by G&C.

The Internal Revenue Service accepted as reasonable the entire amounts of $40,000 and $42,500 which G&C paid to William J. Griffin as compensation for the years 1960 and 1961, respectively.

G&C questions the correctness of the determinations by the Internal Revenue Service that portions of the amounts paid to Arnold Van Etten and William R. Griffin as compensation for 1960 and 1961 did not constitute reasonable compensation and were not deductible by G&C.

■ There is no definite formula by which the question of the reasonableness, for income tax purposes, of compensation in any particular instance can be determined. Irby Construction Co. v. United States, 290 F.2d 824, 826, 154 Ct.Cl. 342, 346 (1961). This is a question of fact that must be determined upon the basis of all the facts in each separate case. Bringwald, Inc. v. United States, 334 F.2d 639, 643, 167 Ct.Cl. 341, 347 (1964); Boyd Construction Co. v. United States, 339 F.2d 620, 624, 168 Ct.Cl. 579, 586 (1964).

■■ The determinations by the Internal Revenue Service on the reasonableness of the compensation paid by taxpayers to their employees are presumed to be correct, and a taxpayer who attacks an administrative decision on this point has the burden of showing by a preponderance of the evidence that the total amounts paid as compensation were reasonable. Duffin v. Lucas, 55 F.2d 786, 796 (6th Cir. 1932), cert. den. 287 U.S. 611, 53 S.Ct. 14, 77 L.Ed. 531 (1932); Northlich, Stolley, Inc. v. United States, 368 F.2d 272, 277, 177 Ct.Cl. 435, 442 (1966).

■ Since Arnold Van Etten and William R. Griffin, the persons whose compensation is under consideration in the present litigation, were stockholders, officers, and directors of G&C, the taxpayer has a special burden of showing by clear and convincing evidence that the amounts paid to Messrs. Van Etten and Griffin were actually reasonable compensation for services performed, and not in reality dividends disguised as compensation. Northlich, Stolley, Inc. v. United States, supra, 368 F.2d at page 278, 177 Ct.Cl. at page 443. Even a payment that is reasonable is not deductible if it was actually a distribution of earnings, as contrasted to compensation for services rendered. Irby Construction Co. v. United States, supra, 290 F.2d at page 827, 154 Ct.Cl. at page 347. In the present case the small amount of dividends paid by the company over the years, as contrasted to its accumulated earnings, is significant.

Perhaps the most significant factor to consider in determining the reasonableness of compensation is the amount paid to similar employees by similar concerns engaged in similar industries. Patton v. Commissioner of Internal Revenue, 168 F.2d 28, 31 (6th Cir. 1948); cf. R. J. Reynolds Tobacco Co. v. United States, 149 F.Supp. 889, 897, 138 Ct.Cl. 1, 14 (1957), cert. den. 355 U.S. 893, 78 S.Ct. 266, 2 L.Ed.2d 191 (1957). In this connection, the plaintiff G&C did not offer any evidence that would permit the court to apply the test of comparability in the present litigation. The defendant, on the other hand, offered summaries of financial statements of Liberty Engineering & Manufacturing Company and of its 70 percent stockholder, Kirk & Blum, and the testimony of Liberty Engineering's president, George Jackson, and chief engineer, Jesse Groves, and of Kirk & Blum's president and chief executive officer, Richard Blum, for the purpose of showing that Liberty Engineering was comparable to G&C and that Jesse Groves' duties and responsibilities for Liberty Engineering made him a comparable employee to Arnold Van Etten.

Liberty Engineering & Manufacturing Company was a Louisville-based mechanical contracting company that employed sheet metal trade union labor in the design, production, and installation of tobacco processing, dust collecting, wood collecting, scrap paper collecting, fume removal, and air conditioning systems, and it also manufactured tobacco processing equipment. G&C and Liberty Engineering performed the same sort of jobs for the same or similar customers. They were both mechanical contractors. They both estimated and bid jobs for tobacco processing companies and for fume, dust, and waste removal systems and for industrial air conditioning systems. Liberty Engineering's total sales for 1960 and 1961 amounted to $1,810,085 and $1,501,043, respectively, while G&C's total sales for the same years

amounted to $1,595,263 and $1,432,410, respectively.

Arnold Van Etten began working for G&C as a draftsman in 1944 at a salary of $1.00 per hour. He was then 19 years old and had graduated from high school two years earlier. He did not attend college. In 1948, Mr. Van Etten was made a field engineer at a salary of $55 per week. He continued in that job through 1952, at which time he was being paid $125 per week. In 1953, he was made vice president of G&C; and he was vice president of the company during the years involved in the present case.

As vice president of G&C, Mr. Van Etten was in charge of the engineering department. He was not, however, a registered engineer licensed to practice in Kentucky.

Mr. Van Etten was primarily responsible for many of the jobs that G&C performed for its principal customer, Brown & Williamson Tobacco Corporation. During the period of time involved in the present litigation, G&C installed various pieces of equipment for Brown & Williamson at its Lexington, Kentucky, stemmery, and also converted its mechanical conveying system there to a pneumatic system, which at the time was an unusual technological advancement. Mr. Van Etten also handled 50 or 60 smaller jobs for Brown & Williamson during the fiscal years 1960 and 1961, from which G&C received about $50,000 in each year.

Mr. Van Etten personally, in August or September of 1960, obtained a large order from American Machine & Foundry Company for various pieces of equipment to be used in the P. Lorillard stemmery at Danville, Virginia. This order amounted to more than $200,000 for the fiscal years 1960 and 1961.

Mr. Van Etten designed and patented substantial improvements on a centrifugal classifier. Since 1960, approximately 800 centrifugal classifiers, containing Mr. Van Etten's patented innovations, have been sold. Such sales

accounted for approximately $360,000. Other than his compensation in the form of salaries and bonuses, Mr. Van Etten did not receive anything for his patent.

Jesse Groves held an engineering degree and was a registered engineer licensed to practice in Kentucky. During 1960 and 1961, he was the chief engineer for Liberty Engineering & Manufacturing Company, and supervised the design, manufacture, and fabrication of air conditioning, dust collecting, fume removal, and general ventilating systems. He was second in charge to George L. Jackson, Liberty Engineering's president, and he was a member of Liberty Engineering's board of directors. He was the officer of Liberty Engineering who was primarily responsible for work performed for the tobacco industry.

Arnold Van Etten and Jesse Groves both supervised the staff engineers of their respective companies and, in turn, both were responsible to the chief executive officers of their respective companies. Both Mr. Van Etten and Mr. Groves were officers and members of the boards of directors of their respective companies. They were both in charge of the production of tobacco processing systems and dust and waste control systems, from customers' drawings and specifications.

It seems to me that the evidence presented by the defendant shows that Arnold Van Etten and Jesse Groves were comparable employees of comparable companies engaged in similar work.

Liberty Engineering & Manufacturing Company's payments to Jesse Groves as compensation for 1960 and 1961 amounted to $17,469 in each of these years, while G&C's payments to Arnold Van Etten as compensation amounted to $34,600 in 1960 and $37,100 in 1961. It will be noted that Mr. Van Etten's purported compensation from G&C in each of the two years was approximately twice as great as the amount which Jesse Groves received from Liberty Engineering. This is a strong indication that the Internal Revenue Service did not commit error when it determined that only $27,-

500 of the amount paid to Arnold Van Etten by G&C in each of the years 1960 and 1961 could properly be regarded as reasonable compensation and as deductible by G&C.

A further circumstance supporting the determination of the Internal Revenue Service is that the amounts paid by G&C to Arnold Van Etten as compensation during the 4-year period immediately preceding 1960 never exceeded $14,400 in any year, and then in 1960 and 1961 his purported compensation was jumped to $34,600 and $37,100, respectively. There is nothing in the evidence to indicate that there was any great increase in Mr. Van Etten's duties and responsibilities for G&C in 1960 or 1961 to justify such a jump in Mr. Van Etten's compensation for services rendered to the company. This warrants an inference that the comparatively large payments which G&C made to Mr. Van Etten in 1960 and 1961 were partially based on factors other than mere compensation for services rendered.

The evidence in the record indicates that William R. Griffin was less experienced than Arnold Van Etten, and that his duties and responsibilities for G&C were less important than those of Mr. Van Etten, during 1960 and 1961. Detailed information concerning William R. Griffin and his work for G&C is set out in finding 75. If, as I believe, the record supports the determination of the Internal Revenue Service that only $27,500 of the total amount paid by G&C to Arnold Van Etten as compensation for each of the years 1960 and 1961 constituted reasonable compensation, it must also be held on the basis of this record that the administrative agency did not commit error in determining that only $20,000 of the amount paid by G&C to William R. Griffin as compensation for each of the years 1960 and 1961 constituted reasonable compensation, and, therefore, that the additional amounts of $13,400 and $16,350 paid to William R. Griffin in 1960 and 1961, respectively, did not constitute reasonable compensation and were not properly deductible by G&C.

As indicated heretofore in this part of the opinion, the plaintiff G&C has failed to sustain its burden of proving by a preponderance of the evidence that the full amounts of $34,600 and $37,100 which G&C paid to Arnold Van Etten in 1960 and 1961, respectively, and the full amounts of $33,400 and $36,350 which G&C paid to William R. Griffin in 1960 and 1961, respectively, constituted reasonable compensation for services rendered by the two officials during those years.

### The "Automobile Expense" Issue

On its income tax returns for the fiscal years 1959, 1960, and 1961, G&C deducted the amounts of $3,198, $4,090, and $7,072, respectively, as automobile expenses.

Upon auditing G&C's income tax returns for the three years mentioned in the preceding paragraph, the Internal Revenue Service disallowed for each year $1,200 of the total amount claimed by G&C as automobile expenses. G&C attacks the correctness of these disallowances in the present litigation.

The figures set out in the first paragraph of this portion of the opinion included the expenses incurred by G&C in connection with three automobiles which the company owned or leased and which were assigned to the three officers of the company, William J. Griffin, Arnold Van Etten, and William R. Griffin, who were also directors and stockholders.

Each of the three officers used his assigned company automobile to commute between his home and the office, driving the automobile home each day after working hours, keeping it at his home overnight, and then driving it to work in the morning. Each officer also used his assigned company automobile whenever it was necessary for him to travel during the business day between the office and outside projects where work was being done by G&C at customers' job sites.

The record does not contain mileage data or other evidence showing the relative extent to which the three officers of G&C used their assigned company automobiles to travel between their homes and the office, on the one hand, and to travel between the office and outside work projects, on the other hand.

The proper rule for application in the present litigation with respect to the automobile expense issue was stated by this court in Boyd Construction Co. v. United States, 339 F.2d 620, 623, 168 Ct.Cl. 579, 584 (1964). In that case, the court said:

> * * * [Automobile] expense is deductible where the automobile is used in furtherance of the taxpayer's business, but automobile expense arising from personal use is not deductible. Where the automobile is used for both business and personal purposes, an allocation must be made. * * * The determination made by the Commissioner is presumed correct. * * * The evidence shows that the automobiles in question were used for both personal and company business, but no record was kept as to the amount of mileage for each purpose. In view thereof, it is considered that the determination by the Commissioner must stand. * * *

In the present litigation, the allocation by the Internal Revenue Service of G&C's automobile expenses as between expenses incurred in furtherance of the company's business and expenses incurred for the personal convenience of the three officers of the company in commuting between their homes and the office is presumptively correct. The administrative determination must be upheld in the absence of clear evidence showing such allocation to have been incorrect.

### The "Repairs or Improvements" Issue

During the fiscal year 1961, G&C expended $363.54 for the cleaning and sandblasting, and $1,174.07 for the painting, of three steel trusses. G&C also expended $2,135 in 1961 for the relocation of lighting fixtures in the company office. All these amounts were deducted as business expenses by

G&C on its income tax return for the fiscal year 1961.

Upon auditing G&C's income tax return for 1961, the Internal Revenue Service disallowed all the deductions mentioned in the preceding paragraph, on the ground that such expenditures were for capital improvements. The correctness of this administrative determination is questioned by G&C in the present litigation.

The three steel trusses had been acquired by G&C in about 1952 for use in the construction of an anticipated addition to G&C's plant. The construction of the plant addition was delayed, however, and the steel trusses were stored outside in the weather for several years. Because of the exposure to the weather, the steel trusses became severely etched and rusted. Finally, when G&C was ready to proceed with the construction of the long-delayed plant addition, it cleaned, sandblasted, and painted the steel trusses in order to make them suitable for use in the structure. After being rehabilitated, the steel trusses were utilized by G&C in the construction of the addition to the plant.

The 1961 expenditures in connection with the relocation of lighting fixtures in the company office were occasioned when G&C carried out a program of relocating certain partitions in the office portion of the company plant. As part of this program, the lighting fixtures in the area were taken down, moved, and relocated, at a cost of $2,135 for labor and materials.

■■■■■■ The deductibility of the expenditures involved in this part of the opinion depends upon the purpose for which such expenditures were made. If their purpose was merely to repair property and thus keep it in good condition during its probable useful life, the expenditures were deductible as business expenses. Illinois Merchants Trust Co., 4 B.T.A. 103, 106 (1926). On the other hand, if the purpose of the expenditures in question was to improve property and thus increase its value, the expenditures were capital in nature and were not deductible as business expenses. Duffy v. Central R. R., 268 U.S. 55, 62–63, 45 S.Ct. 429, 69 L.Ed. 846 (1925). The question of purpose is, of course, a factual issue. Russell Box Co. v. Commissioner of Internal Revenue, 208 F.2d 452, 454 (1st Cir. 1953).

■■■■■■ With respect to the sums that were expended to clean, sandblast, and paint the steel trusses, the plaintiff G&C contends—and seemingly with justification—that these operations merely restored the steel trusses to an ordinarily useful condition. However, the rehabilitation of the steel trusses was incidental to, and an essential part of, the construction of an addition to G&C's plant. The purpose of constructing the plant addition was obviously to improve G&C's property and increase its value. Hence, it is my opinion that the expenditures made by G&C in connection with the construction of the plant addition, including the cost of getting the steel trusses in suitable condition for use as part of the plant addition, were capital expenditures.

The relocation of partitions in the company office was also a program designed to improve G&C's property. Therefore, since the expenditures made by G&C to take down, move, and relocate the lighting fixtures were necessarily part of this property improvement program, it is my opinion that these were also capital expenditures, and not expenses for repairs that G&C could properly deduct on its 1961 income tax return.

### Partial Recoveries

The defendant concedes that, under its theory—which I believe to be correct—that GI was not, in substance, engaged in the conduct of business as a separate entity during 1960 and 1961, and that income reported by GI on its income tax returns was properly taxable to G&C, GI is entitled to recover some of the income taxes which the Internal Revenue Service collected from GI for the fiscal years 1960 and 1961.

Also, the parties have filed a stipulation which shows that G&C was entitled to depreciate certain capital improvements within shorter periods of time than were determined by the Internal Revenue Service in auditing G&C's income tax returns for the fiscal years 1959, 1960, and 1961, and in making deficiency assessments against G&C for those years.

Therefore, it appears that both GI and G&C are entitled to partial recoveries in the present litigation.