R. L. TOWNSEND and E. MILDRED TOWNSEND, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; TWECO PRODUCTS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Townsend v. Commissioner
Docket Nos. 3745-77, 3761-77.
United States Tax Court
T.C. Memo 1980-264; 1980 Tax Ct. Memo LEXIS 324; 40 T.C.M. (CCH) 706; T.C.M. (RIA) 80264; July 21, 1980, Filed Milo M. Unruh, and Roger K. Wilson, for the petitioners. Larry K. Akins, and James T. Million, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: In these consolidated cases, respondent originally determined the following deficiencies in petitioners' Federal income tax: Taxable
Dkt. No.
Petitioner
Year
Deficiency
3745-77
R. L. Townsend and
1973
$ 28,880.17
E. Mildred Townsend
1974
47,410.66
3761-77
Tweco Products, Inc.
1973
73,403.52
1974
121,222.56
*325 By amendment to answer, filed with leave to conform pleadings to proof, respondent has increased his determined deficiencies to: Taxable
Dkt. No.
Petitioner
Year
Deficiency
3745-77
R. L. Townsend and
1973
$ 39,313.18
E. Mildred Townsend
1974
54,530.91
3761-77
Tweco Products, Inc.
1973
109,403.52
1974
147,142.56
The only issues to be decided is whether the salary and bonus paid by Tweco Products, Inc., to its president and stockholder, R. L. Twnsend, was reasonable for purposes of the compensation deduction allowed under section 162(a)(1). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Tweco Products, Inc. (petitioner in docket No. 3761-77), is a corporation under the laws of Kansas. At the time the petition was filed herein, petitioner's principal office and place of business was at Wichita, Kansas. Petitioner filed its Federal income tax returns for the calendar years in issue with the Internal Revenue Service Center, Austin, Texas. *326 R. L. Townsend and E. Mildred Townsend [2] (petitioners in docket No. 3745-77) are husband and wife and resided in Wichita, Kansas, at the time their petition was filed herein. Petitioners filed their joint Federal income tax returns for the years in issue with the Internal Revenue Service Center, Austin, Texas. R. L. Townsend (Townsend or petitioner, where the identity is clear) embarked on a sales career after graduating from high school in 1929.During his employment as an electrical welding equipment salesman, petitioner determined that numerous design deficiencies existed with respect to electrical connectors. These connectors were used to ensure the integrity of an electric welding circuit. Petitioner began designing and manufacturing ground clamps, electrode holders, cable lugs, and cable connectors in the basement of his home in Wichita. [3] For these welding accessories, petitioner adopted the trade name of Tweco (a contraction for Townsend Welding Equipment Company) and introduced them in the marketplace on or about May 1, 1937, through *327 an advertisement in the Welding Engineer magazine. Because of increased demand, petitioner constructed, in 1940, a building in which to house his growing manufacturing business and subsequently twice moved the business to accommodate expanded operations. Petitioner was generally involved in the design and production layout of Tweco's manufacturing plant. It was not until sometime in 1943 that petitioner changed the form of the organization from that of a sole proprietorship to that of a partnership with he and his wife each owning one-half of the newly-formed partnership, Tweco Products Company. In 1954 petitioner and his spouse moved from Kansas to California, leaving the company in the hands of several key employees who were on an incentive pay plan. *328 From California petitioner moved to New Jersey in 1960 and returned to Kansas in 1963. On April 2, 1956, the partnership dissolved and transferred its assets to a corporation known as Tweco Products, Inc. (Tweco or petitioner, where the identity is clear.) Petitioner and his spouse each received 50 percent (500 shares each) of the outstanding stock for their share of the partnership assets transferred. In addition, several trademarks were transferred to Tweco on August 22, 1956, and were subsequently renewed by Tweco. While under no duty to transfer or license either patents or trademarks, petitioner granted Tweco, for a total consideration of $1, a license to use, on a nonexclusive basis, a patent that he had personally obtained. Subsequent to incorporation, several other patents were assigned to Tweco. Thus, on November 13, 1959, petitioner was granted a patent on a "strain relief for stranded cable connection" and transferred same to Tweco for the sum of $1. On December 21, 1971, petitioner and four corporate employees of Tweco were issued letters patent as original inventors of a semi-automatic "mig-gun" welding apparatus. Said patent was transferred to Tweco and it subsequently *329 obtained patents on the apparatus in Australia, Canada, Italy, and the United Kingdom. At the time of the first board of directors' meeting, petitioner was elected Tweco's president, a situation which has never changed since 1956, and his spouse was elected secretary-treasurer. The corporate minutes of April 2, 1956, reflected the following policies regarding loans, loan guarantees, and compensation: Mr. Townsend then stated that prior to the formation of the corporation, $65,000.00 had been borrowed from The Fourth National Bank in Wichita for the purpose of carrying on the business. He further stated that both he and Mrs. Townsend were personally liable for that amount and were required to remain personally liable for the $65,000.00 even though the corporation had assumed the obligation.In addition, he pointed out that as President and Secretary and Treasurer of the corporation, he and Mrs. Townsend would be required to pledge their net worth to support any future bank loans required by the corporation to carry on its business. In addition, the President and Secretary and Treasurer have agreed to loan the corporation $6,000.00 at five per cent (5%) interest, as working capital. *330 All of these facts were pertinent to the question of compensation of the officers. Thereafter, the question of compensation of the officers was discussed and, upon motion duly made, seconded and unanimously carried, it was resolved that compensation for the officers be fixed as follows: For the President of the corporation, four per cent (4%) of the net products sales, payable monthly;
For the First Vice President and General Manager, two per cent (2%) of the net products sales, payable monthly; For the Secretary-Treasurer, the sum of $200.00 per month. [Emphasis supplied.] In 1959, a yearend bonus system was approved and implemented in the following manner. Toward the end of the last quarter of every calendar year, petitioner and the other corporate heads would set aside an amount of net profits for purposes of paying the bonus to all the employees of Tweco who were on the payroll as of November 1 of each year. The formula employed for computing the bonus was skewed toward the employee's payroll dollar, to wit: 1. Each employee would earn one point for each month the employee had worked for Tweco; 2. Of the 100 percent, 25 percent of the net profit bonus *331 was allocated to the total points related to the number of months an employee had worked for Tweco; 3. The remaining 75 percent of the net profit bonus was allocated by allowing each employee to earn one point for each $100 of salary received during the preceding 10 months; 4. Total points accumulated were then divided by each employee's point accumulation with the quotient applied to the portions described above to arrive at the dollar amount of the yearend bonus. Thus, the more an employee earned during the course of the year, the greater the number of bonus points assigned to his aliquot portion of the annual bonus. Except for the years 1958 through 1967, when Tweco elected to be taxed as a small business (subchapter S) corporation, it was taxed as a regular corporation for all of its years. Tweco declared and paid as a dividend to petitioner and his spouse the following amounts: Total
Year
Dividend
1957
$6,000.00
1958
100.00
1962
2.12
Total dividends paid from
$6,102.12
1956 through 1974
In addition, for the years 1968 through 1974, when petitioner and his spouse owned 100 percent of the outstanding stock of Tweco, the net earnings per *332 share and book value per share were as follows: Net Earnings
Book Value
Year
Per Share
Per Share
1968
$ 40.83
$156.31
1969
31.58
187.89
1970
51.21
239.10
1971
96.68
335.78
1972
94.99
430.77
1973
154.29
585.06
1974
137.95
723.01
Petitioner, in addition to the role of chief executive officer and chairman of the board of Tweco, had several other activities of a professional and business nature. During the past 40 years petitioner was a member of the American Welding Society and for the last 30 years he was a member of the National Welding Supply Association. Furthermore, petitioner was the president and chairman of the board of Harper Trucks, Inc. (Harper), and Townsend Properties, Inc. (Properties), during the taxable years in issue. In 1974, petitioner was engaged in selling a business wage incentive plan to other businesses. Said plan represented a business incentive system so petitioner named the company Bisco (Bisco). Petitioner, an unrelated party, and their respective spoouses, incorporated Harper during 1953. It was based in Wichita, Kansas, and manufactured welding cylinder hand trucks which were used by gas welders at the *333 jobsite. In 1973 and 1974, petitioner received compensation from Harper in the amount of $40,271.19 and $28,310.43, respectively. During 1973 petitioner and his spouse owned approximately 46 percent of the outstanding stock of Harper. Dividend payments made by Harper to petitioner were in the respective amounts of $5,100.12 and $5,258.48 in 1973 and 1974. Like amounts were paid to petitioner's spouse during these years. Properties, on the other hand, was organized to furnish Tweco and Harper with the necessary manufacturing facilities. While petitioner devoted some time to the management of Properties, he received no compensation from it during the taxable years in issue. The Bisco Company was organized as a sole proprietorship and was a business service firm designed to provide organizations with motivational incentive pay systems. Petitioner was the sole owner and traveled to cities surrounding Wichita in the hopes of marketing the system. In 1974 petitioner reported a net loss from the operations of Bisco amounting to $6,743.79. Development of the Bisco pay plan was done by petitioner over a number of years. The linchpin for the Bisco plan was that of rewarding *334 certain key employees who were directly responsible for profits and the development of those employees in the absence of the company's owner. Thus, absentee ownership was a significant selling feature of the Bisco plan which petitioner described in his brochure: The BISCO System: It works. Tried and proven since 1954. Great for absentee ownership. Unlocks the shackles for resident owner/managers. The BISCO System was conceived by R. L. Townsend, a successful--and self-made--factory owner whose small business had grown since its 1936 beginning into a demanding mistress, coveting all of his time and attention. In 1952, he announced to his 40 employees his plan to move to California within two years. He then put into motion the nucleus of the present BISCO System, and left in 1954. He knew that he must first motivate his Key People in the right direction, give them responsibilities beyond their current jobs, and arrange to pay them well for their better work. The plan had to work; the plant must continue to grow and prosper, because he was still dependent on it for his own income. It did. Beyond, perhaps even his own fondest dream. For nine years, Townsend *335 was an absentee owner. The company prospered, and when the family returned home, he resumed active management of the now much larger firm. And, although he remains highly mobile, traveling to more than 50 countries around the world in the last 10 years, the company continues to grow. [Emphasis supplied.] Notwithstanding their separate and independent organizational structures, petitioner generally managed and viewed Tweco, Harper, Properties, and Bisco as one entity which provided electrical welding products to the welding industry. To manage and coordinate these many enterprises during the years in issue, petitioner worked an average 10-1/2 hour day, five days a week and an average five-hour day on Saturdays. He has personally written an advertising circular to Tweco distributors, known as "Tweco Letters," from 1944 through the years in issue. Petitioner has been involved with the marketing and production aspects of Tweco's business since its incorporation. Petitioner's many activities were abruptly halted when, on December 11, 1972, he suffered a severe heart attack. Hospitalized from that date to December 31, 1972, petitioner was released and allowed to convalesce *336 at home. However, petitioner returned to Tweco in early January 1973, on a restricted work schedule. He traveled to Hawaii for a brief time in February and returned to work in March on a full-time basis. By 1974, Tweco's key employees had grown to 22. Petitioner viewed a "key employee" as one who heads departments, supervises personnel, plans and executes operations, and holds decision-making responsibilities. During the taxable years in issue, the following employees were considered among the key employees because of their delegated areas of responsibility: Delegated Area of Responsi-
Key Employee
bility and Authority
A. H.W. Beeman
Vice-President
B. Don Ratzlaff
Comptroller
C. E.E. Gibson
Quality Control
D. Marilyn Cook
Assistant to President
E. R.V. Linn
Director of Manufacturing
F. J.R. Kester
Tooling Engineer
G. W.R. Roberts
Production Manager
H. R. Multhaup
Asst. Production Manager
I. K.A. Young
Tooling Engineer
J. Glen Smith
Sales Manager
K. James Scheusslen
Purchasing Agent
L. Richard Tedlock
Director of Advertising
M. Winnie Winchester
Administrative Director
of Front Office Help
N. Larry Shaffer
Traffic Manager
O. Bud Van Sickle
Director of Advertising
*337 Petitioner's compensation (salary and bonus), Tweco's net income before and after tax, the percentage of compensation to such income, the number of employees, and net sales, are as follows: Tweco's
Petitioner's Compen-
Net Taxable Income
% of Compen-
sation Inclusive of
Before Payment of
sation to Net
Year
Bonus
Federal Income Taxes
Income Before Taxes
1956
$ 28,613.00
$ 28,910.00
98.93
1957
35,574.00
5,761.00
617.50
1958
29,883.00
41,601.00
71.83
1959
38,576.00
27,298.00
141.31
1960
41,772.00
22,888.00
182.51
1961
47,830.00
12,959.00
369.09
1962
48,046.00
13,423.00
357.94
1963
52,748.00
35,005.00
150.69
1964
70,103.00
75,573.00
92.76
1965
81,960.00
48,476.00
169.07
1966
99,142.00
84,295.00
117.61
1967
90,712.00
130,663.00
69.42
1968
96,412.00
117,476.00
82.07
1969
105,393.00
89,196.00
118.16
1970
127,055.00
151,295.00
83.98
1971
154,181.00
283,334.00
54.42
1972
211,410.00
270,394.00
78.19
1973
282,924.00 **
441,370.00
64.10
1974
382,547.00 **
412,727.00
92.69
Net Income
% of Compen-
Number
After
sation to Net
of Em-
Federal Tax
Income After
Taxes
Ployees
Net Sales
1956
$ 19,376.89
147.66
48
$ 916,686.65
1957
4,032.63
882.29
48
930,887.36
1958
*
*
41
704,962.59
1959
*
*
44
842,126.14
1960
*
*
47
898,477.40
1961
*
*
58
1,018,961.14
1962
*
*
57
1,085,666.49
1963
*
*
55
1,136,322.00
1964
*
*
69
1,429,799.56
1965
*
*
79
1,714,394.86
1966
*
*
80
2,084,753.00
1967
*
*
75
1,827,976.00
1968
65,330.78
147.57
90
1,973,646.00
1969
50,539.24
208.54
134
2,417,414.00
1970
81,982.70
154.98
121
2,779,176.76
1971
154,693.60
99.67
137
3,177,235.45
1972
151,988.51
139.10
216
4,280,388.40
1973
246,860.11
114.61
259
5,772,842.02
1974
220,717.95
173.32
308
7,930,572.17
*338 A significant product developed and successfully marketed by Tweco is the Tweco "Mig-Gun." The term mig-gun (metal inert gas gun) is a generic name used in the arc welding industry to represent a semi-automatic welding apparatus. Throughout 1968 and most of 1969, basic research in this product was done at the Tweco plant by petitioner and Messrs. Hultine, Kester, Multhaup, Roberts, and Young. Of these latter individuals, Hultine was hired by petitioner to bring the product from its basic research development stage to its actual market introduction. Hultine had the requisite experience with mig-guns before joining Tweco since he conducted tests on other mig-guns for different business concerns. From October 1968 to late 1969 Tweco's prototype mig-gun underwent rigorous testing by Hultine. In late 1969, the Tweco mig-gun was introduced in the marketplace at the American Welding Supply Show in Philadelphia. After this introduction, Hultine became a *339 field trouble-shooter for the Tweco mig-gun. He also compiled product specifications on wire feeders and power sources to assist in the fabrication of an adapter kit to the Tweco mig-gun. After further developmental work by Hultine, who was made a key employee of Tweco by October 1, 1970, an improved heavy-duty version of the original Tweco mig-gun was in production by April 1972. Tweco held no monopoly on the production or distribution of mig-guns. In addition to the typical electrical manufacturing companies, found in Dun & Bradstreet and other reports, several arc welding manufacturers were producing and distributing mig-guns before Tweco had even started its basic research on the Tweco mig-gun. Indeed, other manufacturers produced arc welding accessories similar to those accessories manufactured by Tweco. One such company is Lenco, Inc. (Lenco). For the taxable years in issue, Lenco was composed of several divisions. There were the air tools, automotive, arc welding, electronic, foundry, plastics, and safety clothes divisions. The major product lines of Lenco's arc welding division are ground clamps, electrode holders, cable connectors, and cable lugs. It does not *340 manufacture any mig-guns as Tweco does; nonetheless, a variety of comparable welding accessories were manufactured by Lenco during the taxable years in issue (e.g., cable splicers, terminal connectors, and stud connectors). In contrast to Tweco, Lenco did manufacture, in 1973 and 1974, a specially designed automotive spot welding apparatus which was an integral part of its arc welding product line. The arc welding division accounted for approximately 45 percent of Lenco's net sales during the taxable years in issue. In 1973 and 1974, Lenco had net sales of $4,910,507.51 and $5,564,653.46, respectively. Lenco also manufactured, in its safety clothes division, safety leathers used by welders during arc welding to protect their bodies from burns.Such leather goods were sold as an adjunct to the welding accessories and marketed by Lenco's welding supply dealers and distributors.
During the taxable years in issue, Lenco operated a foundry division (as did Tweco). Lenco's foundry operations produced the copper and brass castings used in the manufacture of the arc welding accessories. Tweco and Lenco also had similar plastic fabrication divisions in that both companies produced in *341 their own respective manufacturing plants, all the plastic components necessary to their arc welding accessories. Lenco was incorporated in 1948 as the Wagner Manufacturing Company by Messrs. Leonard and Wagner.Sometime in 1953 or 1954, Leonard purchased Wagner's stock interest and changed the name from Wagner Manufacturing Company to Lenco, Inc. In 1973 and 1974 Leonard was the president and 58-percent shareholder of Lenco. Aside from Leonard's occasional political diversions (he was a part-time mayor of Jackson, Missouri, and ran for governor of that State), Leonard devoted the majority of his time to Lenco. The compensation, including bonus, paid by Lenco to Leonard amounted to $66,900 in 1973 and $68,512.50 in 1974. During the taxable years hereunder, Lenco had net sales of $4,910,507.51 in 1973 and $5,564.46 in 1974. In the statutory notice of deficiency in docket No. 3745-77, respondent determined that the compensation paid to petitioner was, in part, unreasonable. Respondent found that an annual salary of $130,000 for the taxable years in issue was reasonable and increased petitioner's dividend income by the excess unreasonable compensation of $152,924 in 1973 and *342 $252,547 in 1974. Similarly, in the statutory notice of deficiency in docket No. 3761-77, respondent determined that an annual salary of $130,000 for tax years 1973 and 1974, respectively, was reasonable and disallowed the corresponding deduction of $152,924 and $252,547 for these respective taxable years as excess compensation paid to Tweco's president and shareholder. At the conclusion of the trial, respondent filed a motion on November 6, 1978, to amend his answer to conform the pleadings to proof pursuant to Rule 41(a), Tax Court Rules of Practice and Procedure. In said motion, it is respondent's position that the annual salary for the taxable years in issue was reasonable only to the extent of $55,000 in 1973 and $76,000 in 1974, and that any payments made to petitioner in excess of these amounts should be taxed to him as dividends with the corresponding deductions for these sums disallowed to Tweco. Petitioner opposed this motion by arguing, inter alia, that respondent's conclusions were based upon sheer speculation and conjecture. On November 13, 1978, the Court granted respondent's motion.
OPINION The disposition of this case depends entirely upon whether payments, *343 to the extent they exceeded the amounts allowed by respondent, made by Tweco to petitioner in 1973 and 1974, constituted deductible compensation under section 162(a)(1). Such section allows as a deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered" when such allowances are "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Reasonable bonuses paid for services are also deductible under section 162(a)(1). See section 1.162-9, Income Tax Regs.
The burden of proving reasonableness of the compensation paid rests squarely with petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure; Botany Mills v. United States, 278 U.S. 282 (1929). However, respondent bears the burden of proof for any increased deficiency pleaded in his amended answer. Rule 142(a), Tax Court Rules of Practice and Procedure. In addition, this Court will closely scrutinize any case where the controlling shareholder can establish his own compensation from *344 the corporation to determine whether such compensation is, in substance, a distribution of corporate earnings and profits in the guise of salaries. Heil Beauty Supplies v. Commissioner, 199 F. 2d 193 (8th Cir. 1952), affg. a Memorandum Opinion of this Court; Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694 (1977). Certain nonexclusive factors are gunerally considered relevant in determining the reasonableness of compensation. These factors, emerging from the case of Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court, are as follows: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in *345 the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * The situation must be considered as a whole with no single factor decisive. The question of reasonable compensation is one of fact to be determined from all the facts and circumstances of the case. Charles Schneider & Co. v. Commissioner, 500 F. 2d 148 (8th Cir. 1974), affg. a Memorandum Opinion of this Court; Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 61 T.C. 564 (1974), affd. 528 F. 2d 176 (10th Cir. 1975). In the instant case, respondent contends that for the years in issue, reasonable compensation to Tweco's chief executive officer and sole stockholder (who constructively owned his spouse's 50-percent stock interest) would have been $55,000 in 1973 and $76,000 in 1974, rather than the respective amounts of $282,924 and $382,547 actually paid. He further maintains that only the former amounts are deductible under section 162(a)(1) with such excess amounts representing constructive dividends to Townsend. To the contrary, petitioners argue that the amounts actually *346 paid to Townsend were reasonable in amount, and compensation for services rendered. If petitioners succeed in showing that respondent's determination was erroneous, then this Court must determine from the entire record what was reasonable compensation under the particular facts and circumstances presented hereunder. Pepsi-Cola Bottling Co. of Salina, Inc., supra at 568.
To draw the line between what is reasonable and what is excessive is an intricate task. The case at hand is no exception. We perceive a number of factors which suggest that the compensation paid to petitioner for the years in issue was excessive and therefore consituted a dividend distribution to the extent of Tweco's earnings and profits. It is clear from the record that the underlying nature of petitioner's duties have changed from the time of incorporation to the taxable years in issue. Petitioner would have this Court believe that his duties did not change during the taxable years in issue. However, the record belies such an assertion. It was precisely at such time that petitioner devoted greater energies toward management activities at the business entities of Harper, Properties and Bisco. In *347 particular, this is established by the significant compensation received from Harper in 1973 and 1974. We believe that it is highly improbable and unrealistic to assume that a corporation would pay its minority shareholder-employee an amount of compensation of approximately $40,000 in 1973 and $28,000 in 1974 had such shareholder not rendered valuable personal services. Properties, the real estate corporation which furnished Tweco and Harper with the necessary realty for their operations, was also managed by petitioner, albeit no compensation was forthcoming. Bisco also required a substantial amount of petitioner's time and energy since it is clear from the record that he traveled to various cities to market the system. Thus, petitioner reported $475.60 of travel expenses in 1974 solely attributable to Bisco. It is equally apparent from the record that petitioner considers all of the preceding activities as integrally related to Tweco. [4] This consideration leads to the conclusion that any time devoted to such operations will necessarily detract from the management duties at Tweco. In addition, the lack of compensation from the Bisco[5] and Properties activities could be accounted *348 for, in part, by the high salary and bonus paid by Tweco. Based upon the entire record, we find that the nature of petitioner's duties changed dramatically since incorporation in 1956. Like an individual, a *349 company has a life cycle. During the formative years it is usually under the tutelage of one or more persons who have a direct interest in the company's early development. As the company embarks on its growth phase, additional personnel are hired and consideration is given to developing a sound management base for future stability. Finally, once the company's growth has stabilized, it enters the maturity era wherein its products are well recognized in the marketplace and it is well established in the various financial markets. So it is with Tweco.In the early years petitioner nurtured Tweco's growth. Once its markets were established, petitioner developed a management system that would give his key personnel added responsibilities beyond their current jobs with increased emoluments. Now that Tweco's products are considered an industry standard, with sales of almost $8,000,000 in 1974, the managerial duties of petitioner have declined because of the greater reliance placed upon key employees. As we indicated in our findings of fact, key employees in 1973 and 1974 had responsibility and authority for such duties as advertising, manufacturing, production, quality control, sales, *350 and traffic. We do not believe that petitioner's overall supervisory duties at Tweco are equivalent to these many duties, considering the management diversions of Bisco, Harper and Properties and the extra curricular activities resulting from petitioner's membership in various trade organizations. If they were equivalent, petitioner would have been required to work far more hours than the approximate 57.50 hours per six-day week that he worked during 1973 and 1974. What is more, petitioner suffered a heart attack and was unable to perform any significant duties during his period of recuperation. It is well established that an increase in the salary of an officer without a corresponding increase in his corporate responsibilities is a factor which suggests unreasonableness. Pacific Grains, Inc. v. Commissioner, 399 F. 2d 603, 607 (9th Cir. 1968), affg. a Memorandum Opinion of this Court; Huckins Tool and Die, Inc. v. Commissioner, 289 F. 2d 549 (7th Cir. 1961), affg. a Memorandum Opinion of this Court. During the taxable years at issue, Tweco was the *351 mere alter ego of petitioner and his spouse. Thus, Townsend controlled the board of directors and we find that a significant portion of Tweco's net income was paid to him. The ratio of total compensation paid to net income before taxes for taxable years 1973 and 1974 was 64.10 percent and 92.69 percent, respectively. The compensation paid, when compared to net income before taxes, results in the conclusion that petitioner, to some degree, has been overcompensated. Another factor to be considered is that de minimis dividend distributions were made in prior years and no such distributions in the taxable years at issue. When Tweco's book value and earnings per share (EPS) are considered for these years, it is clear that it was in the financial position, with the requisite liquidity, to distribute its earnings had it so desired. See Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 714 (1977); Dielectric Materials Co. v. Commissioner, 57 T.C. 587, 591 (1972). Tweco, through Townsend, chose to place a zero dividend yield on its stock since 1962, notwithstanding its growth rate in EPS from 1968 through 1974 of 337.86 percent. Such a dividend *352 policy is indicative of the fact that an investment in the stock of Tweco was very unattractive and that the shareholders were not receiving their fair share of its profits. Cf. Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142 (1980). The limits test for the nonpayment of dividends is whether a substantial shareholder who is not actively engaged in the business, is willing to forego the payment of dividends while a significant portion of the corporation's income is paid out as salaries and bonuses. Cf. Charles McCandless Tile Service v. United States, 191 Ct. Cl. 108, 422 F. 2d 1336 (1970). Thus, while we repudiate any "automatic dividend rule" based solely on a poor dividend record, we do find in the instant case that Tweco's dividend policy is one factor which militates against a determination of reasonableness. See also Laure v. Commissioner, 70 T.C. 1087, 1098 (1978); Nor-Cal Adjusters v. Commissioner, 503 F. 2d 359 (9th Cir. 1974), affg. a Memorandum Opinion of this Court. Of equal concern is the *353 salary policy of Tweco. In 1956, it adopted a corporate policy which established a flat 4 percent of net sales as the compensation for Townsend. This policy was in effect during the taxable years in issue even though net sales had grown from under one million in 1956 to almost eight million in 1974.In addition, Tweco adopted a bonus plan in 1959 which provided, inter alia, that all employees would receive a bonus measured by two yardsticks. One would be the employee's tenure and the other would be his salary. The latter measure was given a 75-percent weight for allocating an employee's bonus. Thus, two similarly tenured employees would not receive the same bonus if one of them had a greater salary. While we have never condemned a contingent percentage of sales salary arrangement as unreasonable compensation per se, it requires close examination where adoption of such a plan is far removed in time from the taxable years in issue. As noted above, conditions will change during the normal life cycle of a business. The changing conditions in the instant case, such as increased sales, income, and stockholder's equity, over almost two decades of operation, will make any mechanical *354 formula adopted in prior years unrealistic. See Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 61 T.C. 564 (1974). Neither is the form or method of fixing compensation decisive as to deductibility. Thus, if contingent compensation is paid pursuant to a free bargain made prior to the time the actual services are rendered, it is generally considered valid. Sec. 1.162-7(b)(2), Income Tax Regs. This free bargain element implies an arm's-length agreement which is vitiated in the instant case through petitioner's role as president, chairman of the board and controlling shareholder. Petitioner testified that the 4-percent contingent compensation was determined by "a percentage of sales comparable to what I was making * * * at that time * * * and I selected a percentage equal to what I had been paid." (Emphasis supplied.) Clearly it was petitioner, and not an independent corporate entity, which established and continued to pay this contingent formula which amounted to a distribution of corporate earnings. In addition, there are some *355 serious problems with the "bonus" plan. If its structure is analyzed, one readily discovers that it is heavily biased in favor of employees who have greater salaries. Thus, since petitioner had the longest tenure and greatest salary, he had positioned himself to receive the largest number of bonus points. The mere fact that the bonus is also paid to all employees and that such payment is reasonable, is not determinative of the reasonableness of petitioner's bonus. Northlich, Stolley, Inc. v. United States, 177 Ct. Cl. 435, 368 F. 2d 272 (1966). What is more disturbing is the fact that petitioner was an officer-shareholder of Tweco and, as such, needed no incentive or bonus plan to produce his best efforts. Indeed, a close reading of the record reveals that such a bonus plan was of little value to him since he considered the company as his own and devoted his best efforts thereto. Such unnecessary incentive plans are merely mechanisms for the distribution of profits without relation to services performed. Irby Construction Co. v. United States, 154 Ct. Cl. 342, 290 F. 2d 824 (Ct. Cl. 1961); City Chevrolet Co. v. Commissioner,228 F. 2d 894 (4th Cir. 1956), *356 affg. a Memorandum Opinion of this Court. As we focus our attention on the considerable evidence offered as to comparable business concerns, we must agree with petitoner that such evidence is flawed. Taking the most egregious "comparison" first, respondent offered key business ratios in 185 lines compiled by Dun & Bradstreet, Inc. (D&B), wherein he directs this Court's attention to the industry entitled electrical equipment and supplies, subcategory, "other electrical equipment and supplies." According to the D&B report,.96 percent is the officer compensation for such an industry. Several problems exist with this comparison. First, the cost of doing business ratios in the D&B report are a product of a representative sample of Federal income tax returns filed for taxable years 1971-1972. Thus, respondent would have this Court compare data from 1971 and 1972 to reach conclusions about taxable years 1973 and 1974. Second, respondent has failed to clarify why Tweco's arc welding business falls within the subcategory of "other electrical equipment and supplies." It is just as likely that its business could be classified as "other fabricated metal products" in the report, since *357 most of Tweco's products are metal fabricated. Last, the percentage of compensation paid officers is an average, which could be the mean, median or mode, depending on the measure of central tendency selected. Such incongruous data sheds little light on the question of reasonable compensation. For similar reasons, we find the Research Institute of America (RIA) executive compensation report defective and attribute little probative weight to either report. Cf. McCandless Tile Service v. United States, 191 Ct. Cl. 108, 422 F. 2d 1336 (1970). Respondent strikes another comparison. This is between Lenco, a diversified manufacturing company, and Tweco, an arc welding accessory manufacturing company. While admittedly some degree of comparison exists between these two companies, we find more dissmilarities than similarities when they are laid side by side. A crucial point is that only 45 percent of Lenco's total sales are properly classified as welding division sales. The remainder has little, if any, relationship to petitioner's sales. Thus, only one of Lenco's divisions directly competes with Tweco's products. In addition to the quanitative aspect of the *358 competition, is the qualitative feature. It is clear from the record that numerous welding accessories are in direct competition with one another. However, one of the chief products which Tweco produces--the famous Tweco "Mig-Gun"--has no competitive counter-part at Lenco. Therefore, the product lines lack qualitative comparability on this major product. To a large degree, petitioners have successfully rebutted respondent's efforts in attempting to draw comparisons between Tweco and other companies. However, neither have petitioners introduced any evidence relating to the amounts which would ordinarily be paid for like services by like enterprises under like circumstances. This failure of proof on this factor, while not fatal to petitioners' case, is damaging. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 61 T.C. at 569; Faucette Co. v. Commissioner, 17 T.C. 187, 196 (1951). On the other hand, certain factors are persuasive that the compensation paid Townsend by Tweco in 1973 and 1974 was reasonable. Coming from a modest beginning, Townsend represents the traditional Horatio Alger model. With little education, but enormous *359 industry, he founded and developed a multimillion dollar corporation. During the early years of Tweco's existence Townsend was the sine qua non of its success.However, in the latter years Townsend sought to develop a management base which would guide Tweco into the future. This management base, represented by key employees, largely reduced the managerial burden facing Townsend. There is sufficient evidence in the record to convince this Court that while some of Townsend's duties were reduced, he nevertheless remained the patriarch of Tweco, closely monitoring the entire business operation. Plant design and layout were some of his principal activities during this period. The testimony of the commercial loan officer revealed that Townsend was actively involved in the manufacturing process. Furthermore, Townsend played an active role with Hultine in the development of Tweco's principal product, the Tweco "Mig-Gun." While some of Townsend's managerial duties were relieved because of key employees, it is clear that he was still a very active member of the management team and formulated management policy.
*360 Another factor that bears consideration, with respect to closely-held corporations, is the amount of compensation paid to an officer-shareholder in prior years. Mayson Mfg. Co. v. Commissioner, 178 F. 2d at 119. The five years directly preceding the taxable years in issue, 1968 through 1972, had average (mean) compensation and sales amounts of $138,890 and $2,925,572, respectively. When contrasted to the amounts actually paid Townsend on such increased sales during the taxable years in issue over the average sales of the past five years, the amounts of $55,000 in 1973, and $76,000, in 1974, appear ludicrous. A final consideration in the instant case is the transfer of patents and trademarks by Townsend to Tweco. Respondent argues that a "substantial" part of Townsend's compensation during the taxable years in issue is attributable to the prior transfer of such items. Respondent's argument mises its mark. At no time did an agreement exist between Tweco and Townsend requiring the latter to invent or transfer certain patents and trademarks to the corporation. The record shows that at the time of incorporation Townsend granted it a nonexclusive license in only *361 one patent for the consideration of $1. It was Tweco Products Company (predecessor entity to petitioner) that transferred the right to Tweco to use certain trademarks. During the taxable years in issue, only two patents issued to Townsend existed. Neither of those patents was in existence at the time of Tweco's incorporation. While we recognize that Townsend has the unusual ability of being both an entrepreneur and inventor, Tweco did not hire him for his creative ability or require him to transfer any patents received subsequent to incorporation. If such were the case, the provisions of section 1235 would, in all likelihood, control the outcome.Compare Chilton v. Commissioner, 40 T.C. 552 (1963) with Beausoleil v. Commissioner, 66 T.C. 244 (1976). The record, furthermore, does not support respondent's contention that a substantial portion of Townsend's compensation was attributable to the transfer of patents and trademarks. Because of his amended answer, respondent bears the burden of proof as to the proposed increased deficiency by reason of the further reduction in Townsend's compensatory income. Rule 142(a), Tax Court Rules of Practice *362 and Procedure. There is a dearth of evidence as to the value of the patents and trademarks at the time of their assignment to Tweco. The fact that some inventions (e.g. Tweco "Mig-Gun") were developed by and for the company would negate the inference that Townsend had "all substantial rights" to a patent issued thereon. The record hereunder does not furnish evidence, as respondent maintains, that the contingent compensation arrangement was based, in part, upon the transfer of patents and trademarks. To the contrary, Townsend testified that part of the services rendered Tweco was for his creative ability manifested in the issuance of letters patent and trademarks. According to the witness, it was for these creative services, as well as for the administrative services rendered the corporation, which formed the basis for his compensation. While we recognize the self-serving nature of such testimony, nevertheless, the witness's demeanor exhibited a degree of candor that, in our judgment, supports his testimony. We come, therefore, to the point where we must use our best judgment, after weighing all the evidence, to reconcile and integrate the factors discussed above to our ultimate *363 conclusions. Because of all the factors and circumstances here present, we have given the issue herein a close scrutiny with the result that we agree with neither petitioners nor respondent. On the basis of the entire record we hold that $135,000 in 1973, and $145,000 in 1974, constituted the total reasonable compensation to Townsend for personal services rendered to Tweco, and that such excess, to the extent of Tweco's earnings and profits, is a dividend payment to Townsend. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue.↩
2. Petitioner E. Mildred Townsend is a party herein only because of the joint returns she filed with her husband, R. L. Townsend.↩
3. A ground clamp is a welding accessory which furnishes a stable ground in the electrical circuit once it is attached to the object that is to be welded. An electrode holder is a device which holds the welding rod. Cable lugs facilitate connecting and disconnecting the welding cable to the electric power source. Cable connectors merely connect two or more cable lengths together when additional welding cables are needed.↩
*. During the years 1959 to 1967, inclusive, Tweco elected to be taxed as a subchapter S corporation and therefore was not liable for any tax. ** Petitioner's bonus in 1973 and 1974 was $52,011, and $65,326, respectively.↩
4. Petitioner testified that Bisco, Harper and Properties were part of Tweco--a "total ball of wax": my total ball of wax as I have chosen to call all of the Tweco operations which would include my Fountainhead Company, Tweco Products, Incorporated. Includes Harper Trucks, Incorporated, Townsend Properties, Incorporated. * * * * * *
Bisco is a part of the ball of wax. * * * ↩
5. The record is unclear as to whether any compensation was paid petitioner by Bisco. There is evidence that some compensation may have been paid petitioner since the Schedule C filed by him in 1974 depicts $6,126 as "contract services." Whether these services are related to petitioner's activities in the marketing of the Bisco motivational system is equivocal. It appears doubtful, however, since if such is the case, the compensation (characterized as "contract services") paid petitioner by his sole proprietorship amounts to 90.84 percent of the total operating loss claimed in 1974.↩